**WALLING, Administrator of Wage and Hour Division, Department of Labor, v. SUN PUB. CO.**

Civil Action No. 104.

District Court, W. D. Tennessee, E. D.
Sept. 29, 1942.

Irving J. Levy, Acting Sol., and Bessie Margolin, both of Washington, D. C., and Jeter S. Ray and James H. Hynes, both of Nashville, Tenn., for the Department of Labor.

Elisha Hanson, of Washington, D. C., and Pigford & Key, of Jackson, Tenn., for defendant.

BOYD, District Judge.

The Court makes the following:

Findings of Fact

I. On March 15, 1941, plaintiff brought this action to enjoin defendant from violating the provisions of Sections 15(a) (1), 15(a) (2) and 15(a) (5), of the Fair Labor Standards Act of 1938, 52 Stat. 1060, U.S.C.A. Title 29, Section 201 et seq., referred to herein as the Act.

II. The complaint alleged that defendant, between October 24, 1938, and March 15, 1941, paid certain of its employees engaged in commerce, or in the production of goods for commerce, less than the minimum rates provided for in Section 6 of the Act, and in violation of Sections 6 and 15(a) (2) of the Act; that defendant in the said period worked certain of its employees engaged in commerce or in the production of goods for commerce in excess of the maximum hours provided in Section 7 of the Act, and failed and refused to compensate said employees for their overtime at the rates provided in the Act, and in violation of Sections 7 and 15 (a) (2) of the Act; that defendant during said period sold, shipped, delivered and offered for transportation in interstate commerce from its place of business in Jackson, Tennessee, goods produced in its said place of business in the production of which certain of its employees were employed in violation of Sections 6 and 7 of the Act, and that by so doing defendant had violated the provisions of Section 15 (a) (1) of the Act; that defendant had failed to make and keep records as prescribed by regulations promulgated by the Administrator, and by so doing had violated the provisions of Sections 11(c) and 15(a) (5) of the Act; and, finally, that defendant had knowingly made and recorded, or knowingly caused to be made and recorded, entries in its records that were false and inaccurate and that did not comply with the provisions of the Act and said regulations, and in so doing had violated the provisions of Sections 11(c) and 15(a) (5) of the Act.

III. Defendant operates a radio broadcasting station, WTJS, at Jackson, Tennessee, under license from the Federal Communications Commission. In its answer, defendant admitted that said station was operated in interstate commerce, and during the trial admitted that its employees employed in the broadcasting station, except where specifically exempted by the Act, are covered by the Act. Defendant denied it was producing goods for interstate commerce or employed any persons in commerce in connection with its newspaper operation; asserted certain exemptions under Section 13 (a) (1) of the Act; and affirmatively defended against the allegations in respect to its newspaper operations on the grounds that the attempted application of the Act violated its rights as guaranteed by the First and Fifth Amendments to the Constitution of the United States, and that Congress is without power under the Commerce Clause of the Constitution, Art. 1, § 8, cl. 3, to regu-

late its newspaper operations through such an act as the Fair Labor Standards Act of 1938.

IV. The Sun Publishing Company was first inspected by the Wage and Hour Division in December, 1939, by Inspector John McChord. Subsequent to that inspection, a conference was held in the office of Mr. Pigford, President of and counsel for The Sun Publishing Company, at which conference Mr. Pigford, Mr. Stone, General Manager of the Company, and Labor Department Attorney James H. Hynes were present. This conference took place on May 6, 1940. Some months thereafter, in December, 1940, another inspection was made by Wage and Hour Division Inspector Blynn Evans. This suit was filed March 15, 1941.

V. The minimum wage provisions of the Act were repeatedly violated in regard to the following employees: Richard Wilson and Val Morse (of the radio department); Clyde Arwood, Henry Phillips, Henry Little, and Bernard Applewhite (of the newspaper).

VI. There were repeated and various types of violations of the overtime provisions of the Act, with respect to practically all employees of the newspaper and the radio. All employees were hired and worked on agreed monthly or weekly salaries. They frequently and repeatedly worked longer hours each week than those specified by Section 7 of the Act, and never received additional compensation for such excess hours over and above their weekly or monthly salaries. There was no agreement with any employee as to an hourly rate of pay or overtime compensation. This was true from the effective date of the Act until the time that this suit was filed.

Prior to January, 1940, the defendant's payroll records showed only the weekly or monthly salaries paid to employees and no record was kept of the hours worked by them, except as to the employees in the composing room who worked under the terms of a union contract.

Subsequent to January, 1940, the defendant, for bookkeeping purposes, purported to assign the employees a regular rate of pay. These rates of pay did not represent the legal regular rate of pay or any agreed rate of pay. The employees continued to receive the same fixed weekly or monthly salaries regardless of the number of hours worked, and regardless of the fact that they frequently worked in excess of the maximum workweek specified in Section 7 of the Act.

VII. The defendant kept inaccurate records in the following respects: (1) It instructed employees to turn in a specified number of hours each week, which specified number was frequently less than the number of hours they actually worked, and less than the time required to perform their assigned duties; (2) it recorded erroneous regular rates of pay and amounts for overtime on the payroll records of many of its employees; (3) it repeatedly erased and changed the amounts appearing on its payroll under columns headed "regular rate of pay," "earnings at regular rate of pay for total hours worked," and "earnings—extra for overtime." However, the proof fails to disclose the defendant knowingly made false records.

VIII. The details of these violations were as follows:

1. *Radio Department Announcers, Engineers, and Control Operators.*

These employees worked in the third floor studio of the Sun Publishing Company building and at the transmitter station outside the city limits. Under regulations of the Federal Communications Commission, they are required to note on logs provided for that purpose all hours when the announcers are on the air, the control operators are at the controls, and the engineers are operating the transmission equipment.

Prior to January, 1940, the defendant kept no records of the hours worked by these employees, other than is shown on the radio logs. The time recorded by the employees on the logs included at least the minimum number of hours worked, but did not include all time worked by these employees. Time worked by announcers preparing continuity and announcing remote control programs outside the studio, and time spent by control operators preparing equipment for broadcasting and operating equipment during remote control programs, was not recorded on the logs.

These employees were originally hired at weekly or monthly salaries, regardless of the number of hours worked, and continued to work on that basis up to the time of the institution of suit.

Beginning in January, 1940, these employees were instructed by their superiors to turn in weekly time slips showing a

specified total number of hours worked each week. The employees repeatedly worked more hours than the number specified for them to turn in each week, and their assigned duties frequently required more hours than those specified. These discrepancies appear on the face of the transcripts, comparing the hours recorded on the radio logs with the hours recorded on the time slips and the payroll sheets. Occasionally, when an employee attempted to turn in time slips showing hours worked in excess of the number specified by the Company, the fact that the slip showed more hours than the employee was supposed to work was called to the employee's attention by the defendant's cashier, and same was changed to show the lesser number of hours specified.

### 2. *Press Room Employees.*

For a few months after January, 1940, the employees in the press room turned in time slips showing the actual number of hours they worked and this time was in turn recorded in the Company's payroll sheets. During these months (from January to May, 1940), these employees (Travis and Randolph) frequently worked in excess of the maximum workweek provided in the Act. They were paid the same fixed weekly salary regardless of whether the payroll sheets showed overtime. During the months mentioned these employees, like the other employees, were hired on a weekly salary, without any agreement or understanding as to a regular rate of pay or as to overtime compensation. On the payroll sheets, however, they were recorded as employed at a regular hourly rate of 30 cents per hour, and the difference between their fixed salaries and the total of 30 cents per hour for hours worked was recorded as "extra for overtime."

Sometime in May, 1940, immediately after Mr. Hynes' conference with Messrs. Pigford and Stone, the employees in the press room were instructed by their superiors to turn in no overtime on their slips. At this time, a new rate of pay for these employees was shown on the payroll sheets, calculated by Mr. Stone by dividing the employee's weekly wage by 42 hours. Thereafter, these employees invariably turned in only 42 hours a week until the maximum workweek was lowered to 40 hours a week. When the maximum workweek was lowered to 40 hours on October 24, 1940, these employees were instructed to turn in only 40 hours a week, but their

weekly pay remained the same. However, the regular rate shown on the payroll was changed to conform with the weekly wage divided by 40.

As these employees frequently worked in excess of 42 and 40 hours respectively, during the period in question, the payroll records were inaccurate. Occasionally, when an employee attempted to turn in time slips showing hours worked in excess of the number specified by the Company, the fact that the slip showed more hours than the employee was supposed to work was called to the employee's attention by the defendant's cashier, and same was changed to show the lesser number of hours specified.

### 3. *Composing Room Employees.*

All mechanical employees in the composing room work under a union contract. At the time of the effective date of the Act, the contract provided that employees might work as much as eight hours a day without payment of overtime compensation. This contract was in effect until June, 1939, at which time a new union contract was negotiated requiring the payment of overtime compensation for all hours in excess of 40 per week. Prior to the new contract negotiated in June, 1939, most of these employees in the composing room frequently worked more than 44 hours per week without being paid time and one-half for overtime in accordance with the provisions of the Act. Under the new union contract, the six and one-half hours on Saturday night was considered as eight hours, and all time in excess of six and one-half hours was treated as overtime.

### 4. *Mail Room Employees.*

Part-time employees working in the mailing room, printing out-of-town galleys, addressing bundles, stuffing, rolling, and wrapping papers, preparing bundles for mailing and carrying bundles to the post office, were consistently paid less than the minimum required by the Act, from its effective date until the filing of the suit. One such employee (Henry Phillips), who had worked 27 hours per week since August, 1940, was paid only $3.50 per week. Another employee, Thurston Arwood, who regularly worked at similar tasks, received $5 per week for 30 hours work.

Two employees (Bernard Applewhite and Henry Little), who did similar work on Saturday night, received only 75 cents for about 6 hours' work. These employees kept no time slips at any time. Phillips

and Arwood were arbitrarily credited on the payroll sheets with only one hour or one and one-half hours per day on weekdays, and with fewer hours on Saturday than actually worked.

IX. Cary Brummel, one of defendant's employees who was not paid overtime compensation in accordance with the provisions of the Act, is a radio engineer with the title of "chief radio engineer." During the period involved in this suit, he was employed at a monthly salary of $140. His duties consisted of operating the radio transmitting equipment at the transmitter station, making ordinary equipment repairs when necessary, and "breaking-in" new radio engineers. He holds a federal license as radio engineer, first class. Such licenses are issued by the Federal Communications Commission to applicants passing an examination on elementary principles of radio operation. No formal training or schooling is required to qualify to take such examination. Many persons pass such examination after six to eight months at a radio school, without having completed the regular high school course. Many persons pick up the information needed to pass such examination without taking any formal instruction in radio. Mr. Brummel, for example, had no formal education in radio, but picked up sufficient knowledge of it to qualify as a licensed radio engineer by making a hobby of it in his spare time.

The operation of the radio transmitting equipment is essentially a mechanical task of a skilled nature. It involves turning on the power switch that warms up the transmitter, throwing the switch that puts the transmitter on the air, and checking the frequency and the power periodically to be sure the station is operating in accordance with the technical requirements of the station's license. Under the regulations of the Federal Communications Commission, the frequency and power must be checked every half hour. This consists of reading meters and recording the meter readings on the radio log. Adjustments in the power output or frequency, when necessary, are made merely by turning the proper control knob. Between the periodic readings the engineer can perform other tasks not associated with the operation of the transmitter, but he must remain at the transmitter, or within hearing distance of the monitor. He cannot leave the building for more than a very few minutes at a time,

and he is responsible for its continued proper operation at all times the station is on the air. The federal regulations require that an engineer be on duty at all times when the station is on the air, and an engineer is subject to having his license revoked if anything happens to the station or to the equipment in his absence when he is supposed to be on duty.

During the period involved in this suit, there were one or two other radio engineers employed by the defendant. Mr. Brummel alternated with the other engineer or engineers in operating the transmitter. He took his shifts on duty just as they did, except that his hours on duty were substantially longer. During his shifts, he performed the same duties the other engineers performed when they were on duty. The chief radio engineer was not on duty when another radio engineer was, and when the chief engineer was on duty no other engineer was.

Brummel was also responsible for making ordinary repairs to equipment, such as replacing burned out tubes or condensers, and fixing broken connections or corroded sockets, when such repairs became necessary during his shift. The other engineers were responsible for similar minor repairs becoming necessary during their shifts. Brummel makes his home at the transmitter station and usually leaves word where he will be when he goes off the premises on his off hours. However, he has never been called, during the period involved in this suit, and has rarely been called at any time, to make repairs during another engineer's shift.

For alterations of major importance, the company hires consulting engineers. For example, when the wattage of the station was stepped up, the defendant called in the firm of Page and Davis, of Washington, D. C., to make the plans for the increase. Brummel installed the new equipment in accordance with detailed directions and charts furnished to him.

Brummel was responsible for "breaking-in" new radio engineers, or getting them acquainted with the meters and the switches, and their operation. This required only a few days. Other than that, Brummel was not on duty when another engineer was on, and had no supervision over the other radio engineers, nor over any other employees. He had no authority to hire or fire any employee, nor was he ever

called upon to make recommendations or suggestions as to hiring or firing, or as to the promotion or any other change in the status or working conditions of other employees.

Brummel's duties, as "chief radio engineer," are not intellectual in the ordinary sense of the word, but are more in the nature of skilled mechanical work. They do not require the consistent exercise of discretion and judgment in their performance, nor are they original or creative in character.

X. P. D. Kersh was employed by defendant as working foreman of the composing room. His salary was $47.50 and $50 per week during the period involved in this suit. He is a member of the International Typographical Union, as are all the mechanical employees in the composing room. He had general supervision over all employees in the composing room, but he himself spent about 80% of his time doing mechanical work. His regular duties included the mechanical work required to make up the pages of the paper after the type and plates came from the linotype machines. He spent approximately seven hours a day at such work. His other duties were to keep the time records of the men in his department and to keep a record of the foreign advertising schedules. These latter duties required about one hour and fifteen minutes a day. Kersh, through power delegated to him by the contract entered into between the company and the union, had the right to hire and fire men in his department and to assign the men specified duties and to arrange their working schedules.

XI. Linus Lydel Sims was hired as a newspaper reporter by the Sun Publishing Company in January, 1939. He is a college graduate with a general academic education and with no special formal education in journalism. He was paid $30 per week by defendant for covering sports events in Jackson, Tennessee, and vicinity, and also each day throughout the greater period of his employment spent several hours handling the news that came into the Sun Publishing Company on the Associated Press wires, writing headings for it and cutting it to appropriate length for publication in the Jackson Sun. He was assigned a specified number of hours to be worked during the week and was presumably expected to perform his duties within the specified hours. He was required to fill out time slips each week (after January, 1940), just

as all other ordinary employees were required to do. At the time he worked for the defendant, he corresponded for a Nashville paper and received compensation equal to one-fourth of his salary from the defendant. He covered many of his assignments for both papers, but credited his time thereon exclusively to the defendant. Furthermore, he availed himself of the work done by other reporters employed by the defendant to supply his Nashville paper with news. Likewise, he sent to and received queries from his Nashville employer during the time he regarded himself as working for the defendant.

XII. Leslie R. Brooks, Jr., was "program director" or "chief announcer" of the Radio Studio. His duties were part time announcing, as is shown by his entries on the radio log, scheduling programs, writing continuity and assigning other studio employees their tasks in the programs. Brooks worked on an average of 48 hours per week, at least half of which time was spent performing the duties identical to the duties of the other announcers. He was paid $80 per month until April, 1939, when he was raised to $100 per month, which was his regular salary until March, 1941, when he was raised to $120 per month. He had no right to hire or fire employees, all supervision in that regard being vested in Mr. Aaron Robinson, the commercial manager of the Radio Station. Robinson specified the number of hours Brooks was to work each week and he was told to turn in time slips for that number of hours.

XIII. The following stipulation between the parties with reference to certain pertinent facts is adopted as the Court's findings:

### "Stipulation

"It is hereby stipulated and agreed by and between the parties in the above styled cause, without waiving the right to introduce additional testimony upon the trial as to the subjects covered herein as well as all other subjects, and further without waiving the right to object to the introduction of all or any part of this stipulation as irrelevant or immaterial to issues arising in the above styled cause, as follows:

"1. All facts hereinafter set forth, except where expressly qualified, relate to the entire period involved in the above styled cause.

"2. The Sun Publishing Company, a Tennessee corporation, with offices and

plant in Jackson, Tennessee, published a daily (Monday through Friday evening) and a Sunday newspaper, named 'The Jackson Sun.' It had a daily paid circulation of 8,461 copies in 1938; 8,789 copies in 1939; 9,127 copies in 1940 and 1941; and a paid Sunday circulation approximating 11,000 copies for each of said years. The Sun Publishing Company published and shipped to points outside the State of Tennessee an average of approximately 200 paid copies of said newspaper each day (excluding Saturday), or an average total of approximately 63,000 copies per year. This amounted to approximately 150,000 paid copies of said newspaper being published and shipped to points outside the State of Tennessee during the period involved in the above cause.

"The Jackson Sun is the only newspaper published in Jackson.

"Fourteen weekly newspapers are published in the vicinity of Jackson. They are:

tion under 3,000, while 11,496, or 85% of the total, had circulations under 5,000. In the weekly, semi-weekly and tri-weekly fields 9,775, or 91% of the total in these fields, had circulations under 3,000. In the daily field 521, or 25% of all dailies, had circulations under 3,000, and in the Sunday field 101, or 17% of all Sundays, had circulations under 3,000.

"In the group between 3,000 and 5,000 circulation, 489 were weeklies and 467 dailies.

"In the group between 5,000 and 10,000, there were 455 dailies, and 233 weeklies, semi-weeklies and tri-weeklies.

"Only 654 dailies and 218 weeklies, semi-weeklies and tri-weeklies had over 10,000 circulation.

"It was further pointed out in the same study (p. 67) that by reason of the exemption in Section 13 (a) (8) of the Act practically all of 9,755 weekly and semi-weekly

| Newspaper | Where Published | Miles from Jackson | Circulation |
|---|---|---|---|
| Crockett County Sentinel | Bells, Tennessee | 18 | 1,000 |
| The Bolivar Bulletin | Bolivar, Tennessee | 28 | 1,800 |
| States-Graphic | Brownsville, Tennessee | 27 | 1,800 |
| The Gazette | Greenfield, Tennessee | 41 | 1,000 |
| Chester County Independent | Henderson, Tennessee | 17 | 1,222 |
| Courier-Chronical | Humboldt, Tennessee | 17 | 1,750 |
| The Progress | Lexington, Tennessee | 27 | 1,200 |
| The Banner | McKenzie, Tennessee | 45 | 1,774 |
| The Exchange | Milan, Tennessee | 24 | 1,000 |
| News-Leder | Parsons, Tennessee | 43 | 1,225 |
| Enterprise | Ripley, Tennessee | 45 | 1,100 |
| McNairy County Independent | Selmer, Tennessee | 36 | 1,000 |
| The Gazette | Trenton, Tennessee | 28 | 1,800 |
| Hardeman County Times | Bolivar, Tennessee | 28 | 1,365 |

"Each of the foregoing newspapers is probably exempt from the applicability of the Fair Labor Standards Act of 1938 by reason of the provision in Section 13 (a) (8) thereof.

"A study of small newspapers recently made by the Wage and Hour Division, a copy of which is attached hereto as Exhibit 'A', used Ayer's Newspaper and Periodical Directory of 1938 for fact material. This study, which admittedly is accurate, (p. 4) relates that a total of 13,476 newspapers published in 1938, daily, daily and Sunday, weekly, semi-weekly and tri-weekly, 10,397, or 77% of the total, had circula-

newspapers having less than 3,000 circulation in 1938, and constituting 72% of all newspapers and 91% of all weekly and semi-weekly newspapers, were exempt from the Act.

"3. The Sun Publishing Company is a member of the Associated Press. The latter is a non-profit membership corporation, organized under the laws of the State of New York, for the purpose of gathering news throughout the world and distributing that news to the members for publication in their newspapers. Membership in the Associated Press is confined to newspaper publishers, who in turn are obli-

gated to make available to the Associated Press any of the local news which they gather. Each member newspaper forwards news deemed important to the bureau headquarters of its area, which in turn distributes it to member newspapers within the assigned area and to other bureau or division points for use within their respective areas. In addition, reporters and employees of the Associated Press gather news which is transmitted to the appropriate bureau headquarters to be forwarded to members within the area served by that headquarters and to other bureaus or divisions for distribution to member newspapers within their respective areas. The Associated Press uses a wire system of approximately 285,000 miles, leased from telegraph and telephone companies, as the basic framework for its communications with its members. Wireless, cable, and sometimes mail and messengers are also used as means of communication in receiving and transmitting news. Each bureau point is connected directly or indirectly with every other by telegraph wires for exchange of news. Regional circuits supplement primary circuits. The Associated Press' lines of communication are utilized throughout the twenty-four hours of every day.

"The Sun Publishing Company is linked to this nation-wide network through direct Western Union wire to bureau headquarters in Nashville, Tennessee, which is in turn connected to bureau headquarters in Louisville, Kentucky, and division headquarters in Atlanta, Georgia. Prior to September, 1940, all subject matter received over Associated Press wire by The Jackson Sun was relayed by Associated Press employees directly from Nashville, Tennessee. Subsequent to September, 1940, The Jackson Sun was connected to the Tennessee-Kentucky wire and most national and international news has been relayed to it by Associated Press employees at Louisville, Kentucky, through automatic relay equipment in Nashville, Tennessee, state news being still sent from Nashville and other Tennessee points.

"The Associated Press maintains a teletype in the office of The Jackson Sun to deliver its reports to that newspaper. These reports, from whatever source gathered, wherever in the world, are sent to the Sun over the wire of the Associated Press from its office in Louisville, Kentucky. When the Associated Press requests a story from The Jackson Sun that story is sent over the Associated Press wire from the office of The Jackson Sun in Jackson, Tennessee, to the office of the Associated Press in Nashville, Tennessee. A few hundred words are sent each week. Reports are received from 6 A.M. to 3 P.M. Mondays through Fridays, inclusive, and from 5 P.M. until midnight on Saturday. An average of 24,000 words are received by The Sun each day.

"The Jackson Sun publishes some, although not all, of the news it receives from the Associated Press. The news that is published is selected by the editor, who in turn cuts its length where necessary to suit his space requirements, and writes heads and sub-heads for it. Then it goes to the composing room, where it is set in type. Later, it is placed in a page form. When all of the other material for that page is assembled, a flat metal cast is made of the entire page in the stereotyping room. When all of the pages are ready, round or press casts are made. These, in turn, are placed on the press. When the press begins to operate, an impression is made on the newsprint paper thereon and the type and pictures in the casts are transposed to that paper. The object containing this transposition comes off the press and is the printed newspaper. The whole procedure of printing and publishing each daily issue is carried out within one day.

"4. The Sun Publishing Company also buys the news service of the United Press (a privately owned news organization engaged in world wide news gathering) primarily for use by the radio station, but with the right to publish it, if the company so desires, in the newspaper. But little of the United Press News is published in The Jackson Sun.

"The United Press maintains more than 97 news collecting bureaus situated throughout the United States feeding into various division points. From these points, over a leased wire system of 150,000 miles, news is gathered and distributed to its subscribers, including The Sun Publishing Company, which is connected to the system through Southern Bell Telephone Company wires direct to the United Press Associations' Bureau office in Atlanta, Georgia.

"5. Pursuant to contracts existing between the defendant and the United Press Associations, since January 16, 1939, the defendant has received daily from the said United Press Associations by wire, in-

formation, news tips, news, and feature stories for publication in The Jackson Sun. Information and feature stories have been regularly published by defendant in its week day and Sunday issues. Most of said information, news, and feature stories originated in states other than the State of Tennessee. The defendant provides the quarters and power necessary to receive such news from the United Press Associations.

"6. All of the news and feature stories published by the Sun Publishing Company in its newspaper under 'date lines' of cities in foreign countries, or cities and towns located in states other than the State of Tennessee, have been transmitted to the Sun Publishing Company in Jackson, Tennessee, as hereinbefore described, from cities and towns located in states other than the State of Tennessee or foreign countries.

"7. The defendant has regularly received by mail from sources outside the State of Tennessee the copy, proof, matrix forms, etc., of feature articles and cartoons which are published daily in The Jackson Sun. Among such features are:

"(1) From the offices of N.E.A. Service, Inc., in Ohio: 'Medicine in the News,' by Morris Fishbein; 'With Edson in Washington,' by Peter Edson; Cross-word puzzles; Serial stories; Editorial cartoons; Comic strips; News and feature pictures;

"(2) From the offices of King Features Syndicate in New York: 'News Behind the News,' by Paul Mallon; 'Human Side of the News,' by Edwin C. Hill; 'Behind the Scenes in Hollywood,' by Harrison Carroll; 'Broadway Medley,' by Leonard Lyons; 'Contract Bridge,' by Eli Culbertson; 'Arthur "Bugs" Baer,'; 'Press Comments'; 'So They Say'; 'Daily Thought'; Comics; News and feature pictures.

"(3) Pictures and features from World Wide Service, New York, and The Central Press Association in Ohio.

"8. The Sun Publishing Company receives in fully prepared and printed form each week from points outside the State of Tennessee, a four page colored comic supplement which it distributes together with its Sunday issue to all subscribers, both within and without the State of Tennessee.

"9. Most of the revenue of the Sun Publishing Company is derived from ad-vertising. Approximately 10% of the total advertising revenue for the combined years of 1939-1940, was derived from general or national advertising published for the account of out-of-state producers or distributors of nationally known products. Such advertising as published by the Sun Publishing Company was obtained from numerous advertising agencies located in various cities scattered over the United States and outside of the State of Tennessee. The attached lists marked Exhibit 'B' are representative of the advertising agencies, national advertisers or their products, for which advertising was published by the defendant.

"The defendant has a contract with the Branham Company of Chicago, Illinois, to act as its national advertising representative. The Branham Company maintains branches in various parts of the country, contacts various advertising agencies and solicits advertising from them to be run in the newspapers it represents. Most of the orders for national advertising are sent direct to The Jackson Sun by the various advertising agencies, from practically every state in the country. The defendant regularly receives mats, plates and other materials from sources outside the state for use in printing the advertising. In turn, the defendant regularly sends to the advertiser, or its agent, copies of the paper in which the advertisement appears or tear sheets and other proof of publication. Orders for such advertising, and the instructions in regard thereto, are received through the regular channels of interstate communication, such as mail and telegraph.

"The Jackson Sun regularly receives advertising mats from out-of-state sources, such as the Meyer-Both Company located in New York City. The Meyer-Both Company manufactures mats, which when used are cast into plates, and used to print pictures, illustrating advertisements. The defendant has been a regular subscriber to the Meyer-Both service, which sends to its subscribers from New York City each month a catalogue of illustrations and corresponding mats. Local merchants select illustrations from the catalogue and their advertisements are then set up by Sun Publishing employees from the Meyer-Both mats that correspond to the chosen illustration. Local advertisers, other than those who use the Meyer-Both mats, frequently furnish mats or cuts received from

out-of-state sources for use as illustrations in their advertising.

"10. The tables (copies of which are attached hereto and marked Exhibit 'C') showing percentage space distribution of three weeks' publication in 1940, accurately reflect the contents and space distribution of newspapers published by defendant in typical weeks during the period involved in this suit.

"Of the entire contents of The Jackson Sun, approximately 64% are gathered within the State of Tennessee, and the balance of 36% outside of the State of Tennessee.

"11. Newsprint, inks, linotype metal, stereotype metal, and mats are the chief materials used by the defendant in printing its newspaper. Substantially all of these materials used by the defendant are produced in states other than the State of Tennessee and shipped in to the defendant's plant from points outside of Tennessee.

"The defendant purchases a large portion of the newsprint it consumes from the G. H. Mead Company, of Dayton, Ohio, representing the Abitibi Power and Paper Company of Sault Ste. Marie, Ontario, Canada, and the Thunder Bay Paper Company, Port Arthur, Ontario, from the plants of which the newsprint was shipped by freight consigned to The Sun Publishing Company in Jackson, Tennessee. The remainder of its newsprint defendant purchased from The Carroll Company, of Jackson, Tennessee, representing The Minnesota and Ontario Paper Company, International Falls, Minnesota, from the plant of which the Newsprint was shipped by freight consigned to The Sun Publishing Company, Jackson, Tennessee. The defendant in return regularly shipped the cores of the newsprint rolls back to the manufacturers of the newsprint in Canada or Minnesota. The cost to The Sun Publishing Company of newsprint consumed annually approximated $21,000.

"The Sun Publishing Company uses two 500 pound drums of ink a month at an approximate cost of $50.00. This ink is purchased from the George H. Morrill Company, Chicago, Illinois, and is shipped to The Sun Publishing Company from St. Louis, Missouri. The Sun Publishing Company in turn regularly returns the metal drums in which the ink is shipped, to the distributor in Missouri.

"The Sun Publishing Company purchases its metal, for both linotype and stereotype machines, from the National Lead Company located at St. Louis, Missouri. Approximately two tons of linotype metal and two and one-fourth tons of stereotype metal is used per year at an annual cost approximating $200 and $230 per year respectively. Periodically, The Sun Publishing Company sends back to the processor in St. Louis, Missouri, the dross from metals used by it.

"Most of the mats used by The Sun Publishing Company were purchased from the Certified Mat Corporation, New York City, and were shipped to defendant from West Grotton, Massachusetts. On an average, The Sun Publishing Company purchased and received two cases of mats per month at an average cost of $120.00.

"Linotype supplies and replacements were purchased from the Mergenthaler Linotype Company, New Orleans, Louisiana, and shipped to The Sun Publishing Company from that point. The monthly expenditure for linotype supplies and replacements approximated $50.00.

"12. From October, 1938, until January 19, 1940, radio station WTJS, owned by The Sun Publishing Company and operated by its employees, broadcasted programs on the air for one hundred and five hours per week. On January 20, 1940, the weekly hours for broadcasting were stepped up to one hundred and nineteen hours, which schedule was maintained until September 15, 1940. On September 16, 1940, the weekly hours for broadcasting were stepped up to one hundred and twenty-five, which broadcasting schedule was maintained through March 15, 1941."

### Conclusions of Law

I. The jurisdiction of this cause of action and of the parties is conferred upon the Court by Section 17 of the Fair Labor Standards Act of 1938, Title 29 U.S.C.A., Section 201 et seq., hereinafter referred to as the Act.

II. Section 4(b) of the Act does not require that the Attorney General be a party to or participate in an action for an injunction against future violations of the Act, and this action was properly instituted and may be maintained by the Administrator of the Wage and Hour Division.

III. The Act does not violate the rights of the defendant guaranteed by the

First Amendment to the Constitution; nor does the application of the Act or the exemption contained in Section 13(a) (8) constitute an unreasonable, arbitrary, or injurious discrimination against defendant in violation of the rights guaranteed by the Fifth Amendment to the Constitution.

■ IV. Defendant's employees engaged in the gathering, receiving, handling, printing, communication, preparation and circulation of news, information and intelligence from nation-wide and world-wide sources are engaged in interstate transmission and communication of news and are, therefore, engaged in interstate commerce within the meaning of the Fair Labor Standards Act of 1938.

■ V. Defendant's employees engaged in the preparation, printing and handling of newspapers for regular daily shipment outside the state are engaged in the production of goods for interstate commerce within the meaning of the Act, notwithstanding the fact that only a small proportion of the newspapers printed are shipped outside the state.

■ VI. The facts in this case constitute violation of the minimum wage provisions of the Act. Sections 6 and 15(a) (2) of the Act.

■ VII. Defendant violated Section 7 of the Act by failing and refusing to credit and pay employees for all overtime hours actually worked.

■ VIII. In the instant case where employees worked for a fixed weekly salary and a fluctuating number of hours each week, their regular rate of pay is determined by dividing their weekly salary by the actual hours worked. The bookkeeping system inaugurated by defendant in January, 1940, did not change the applicable principles for determining the regular rate of pay.

■ IX. The hours for which employees must be compensated at the standards prescribed in the Act include not only the hours that employees were actually engaged in manual labor, but also such hours as they were obliged to remain on or near the premises to enable them to carry out the tasks for which they were responsible. In particular, the radio engineers are entitled to compensation for the periods they are on duty between the half-hourly meter readings when they are responsible for the successful operation of the apparatus or equipment under their charge.

■ X. An employer subject to any provision of the Act is required to make, keep, and preserve records of the number of hours worked by his employees and of the other information prescribed in the Regulations of the Administrator of the Wage and Hour Division issued pursuant to Section 11(c) of the Act. He cannot escape this duty by delegating it. The personal duty rests on him to inquire into the conditions prevailing in his business and he is not relieved of this duty because the extent of his business may preclude his personal supervision and compel reliance on subordinates. The employer does not discharge his duty with the mere promulgation of a rule.

■ The failure of the defendant to maintain the records required by the Regulations of the Administrator, and the maintenance of inaccurate records as to the number of hours worked by many of its employees, resulted in violations of Sections 11(c) and 15(a) (5) of the Act. Under the facts of this case, defendant has not knowingly made false records contrary to Section 15(a) (5) of the Act.

■ XI. By shipping, selling, and delivering in interstate commerce, newspapers produced by employees who had not been compensated in accordance with the requirements of Section 6 and Section 7 of the Act, defendant has violated the provisions of Section 15(a) (1) of the Act.

■ XII. The defendant's establishment is not a "retail or service establishment" within the meaning of Section 13 (a) (2) of the Act.

■ XIII. The standards established by the Administrator's Regulations defining the term "bona fide executive, administrative, professional capacity" are all amply supported by facts of common knowledge and are justified by practical administrative considerations. The Regulations are therefore valid and binding. It is not the province of the Court to inquire into the motives or considerations which prompted the Administrator to adopt such standards.

■ The chief radio engineer, the working foreman, and the newspaper reporters employed by defendant did not meet the qualifications specified in the Administrator's Regulations, Part 541, either

as originally drafted or as amended in October, 1940. Such employees, therefore, are not exempt as executive, administrative or professional employees within the meaning of Section 13(a) (1) of the Act.

XIV. The plaintiff is entitled to judgment granting relief in accordance with these findings and conclusions.