WALLING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v. PANTHER CREEK MINES, Inc.

No. 8442.

Circuit Court of Appeals, Seventh Circuit.

March 1, 1945.

Douglas B. Maggs, of Washington, D. C., Kenneth P. Montgomery and Victor M. Harding, Jr., both of Chicago, Ill., and Bessie Margolin, Asst. Sol., Department of Labor, and Joseph I. Nachman, Atty., U. S. Department of Labor, both of Washington, D. C., for appellant.

Clayton J. Barber and Samuel C. Fielden, both of Springfield, Ill., for appellee.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

The Administrator of the Wage and Hour Division sought an injunction under § 17 of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 217, to restrain defendant from violating the minimum wage, overtime, and record-keeping requirements of said Act. After a trial and after making findings of fact and conclusions of law, the District Court dismissed the suit for want of equity. The Administrator appeals.

The principal question is whether defendant's record-keeping system met the legal requirements.

Defendant contends that the only real issue is whether the court abused its discretion in denying the injunctive relief sought. The Administrator rightly con-

cedes that granting an injunction under § 17 of the Act lies within the trial court's discretion, Walling v. T. Buettner & Co., 7 Cir., 133 F.2d 306; cf. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754, and that the injunction is not to be used to punish past offenses, but only in a proper case to prevent wrongdoing in the future. But the Administrator also correctly asserts that where the evidence clearly shows existing violations and the likelihood, indeed, the virtual certainty, of future violations, a decision denying an injunction will be reversed. Goshen Mfg. Co. v. Myers Mfg. Co., 242 U.S. 202, 37 S.Ct. 105, 61 L.Ed. 248; Hughes Tool Co. v. Owen, 5 Cir., 123 F.2d 950; Walling v. Mid-Continent Pipe Line Co., 10 Cir., 143 F.2d 308. We emphasize the point that this is not a case where the alleged unlawful practices have been abandoned, and compliance effected, with the promise that they will not be resumed. On the contrary, the challenged practices are continuing, and defendant asserts that they are lawful. No promise has been made to discontinue or correct them. The trial court was of the opinion that the defendant may have committed violations of the Act, and if it did, the violations were only "technical." Thus the question boils down to whether the practices are illegal, for if they are, since the standards of the public interest, not the requirements of private litigation, measure the need for injunctive relief, an injunction should be issued.

Defendant operates three coal mines from which coal moves in interstate commerce. No question of coverage is raised. It employs some 650 men, the overwhelming percentage being diggers. The diggers are paid on a tonnage basis, and the others on a salary or daily basis. The record shows that it was defendant's practice for a long period to use arbitrary, fictitious figures instead of the hours actually worked in respect to certain of its non-digging employees. For example, the stenographer was shown on the company's books as working 54 hours a week, whereas the testimony showed that she never worked more than 48 hours a week and frequently less than that, so the hours recorded on the books did not represent the hours actually worked. However, we do not express any opinion on the practices with respect to the non-digging employees for it is true that on the last day of the trial defendant's superintendent stated that the company was then keeping the actual hours worked by the salaried employees. Since our conclusion as to the records of the diggers controls our decision on this appeal, it is not necessary to treat the question of the sufficiency and accuracy of the records of the other employees.

Section 11(c) of the Act, 29 U.S. C.A. § 211(c), provides that every employer subject to any provision of the Act shall make, keep, and preserve such records of his employees' wages and hours as the Administrator shall prescribe by regulation or order as necessary or appropriate for the enforcement of the Act or the regulations or orders thereunder. The record-keeping requirements are valid, United States v. Darby, 312 U.S. 100, 125, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430, and if reasonable and pertinent they are binding on the courts. Fanelli v. United States Gypsum Co., 2 Cir., 141 F.2d 216, 218; Walling v. Yeakley, 10 Cir., 140 F.2d 830; Walling v. Sun Publishing Co., 6 Cir., 140 F.2d 445; George Lawley & Son Corporation v. South, 1 Cir., 140 F.2d 439, 151 A.L.R. 1081; cf. Federal Security Adm'r v. Quaker Oats Co., 318 U.S. 218, 228, 63 S.Ct. 589, 87 L.Ed. 724; United States v. George S. Bush & Co., 310 U.S. 371, 380, 60 S.Ct. 944, 84 L.Ed. 1259. Even before the effective date of the Act, the Administrator published regulations in the Federal Register which provided for record-keeping, 3 Fed.Reg. 2533. They provide, inter alia, that the employer's records show for each employee: the hours worked each workday and total hours worked each workweek; regular hourly rate of pay if overtime is worked and overtime excess compensation is due; the basis on which wages are paid; total daily or weekly straight-time earnings (excluding overtime excess compensation); and total wages paid each pay period, 29 Code of Fed.Reg.Cum.Supp., Chap. V, Part 516.

On this appeal the principal requirement to be considered will be the primary one, namely, the hours worked each workday and total hours worked each workweek. The Administrator says he cannot tell how extensive defendant's violations have been because this requirement has not been met.

In studying the record and exhibits, certain striking things have impressed us. First and foremost has been defendant's

admission that its own records are unreliable and its willingness to impeach them. Then, too, on its exhibits 1 to 43, what purported to be an objective statement of days worked, was shown to be an estimate based on the clerk's or superintendent's general notion of what a man could or should produce, rather than what the attendance record showed. Defendant concedes numerous instances of inaccuracy; the system was admittedly slipshod; and its past history does not augur future compliance.

Taking these points up in reverse order, we look first to the history of this controversy. In May, 1941, the Wage and Hour inspectors found that defendant's payroll records showed the quantity of coal each man produced per day (and the union contract specified the amount he was to be paid per ton), but failed to reveal the number of hours worked. Defendant's officers were expressly told that records showing this must be kept. It was not until four months later that defendant began to keep a so-called attendance record. Yet even in keeping this meager attendance record, defendant, from June, 1942 up until March, 1943, at Mine No. 5, relapsed into not entering it on the payroll record.

In view of the slipshod character of defendant's system, it is not strange that inaccuracies resulted. A brief description of the system is necessary. The term "attendance record" is a misnomer, for in actuality, it was a list of absences. Each miner had a number, and the "attendance record" consisted of lines of numbers (not even in columnar form) scribbled in pencil on a small piece of paper, which defendant calls an "attendance slip." These loose slips were smudged with coal dirt, hardly legible, sometimes undated or two slips would bear the same date, and were put in a drawer in no particular order. At Mine No. 4 these absences were not recorded on attendance slips, but in a book or on the payroll record itself. The absences were posted to the payroll record by a small zero, in some periods, not day by day or at regular intervals but after some time. These attendance slips or entries in the book had their source in checks left on the tally board after the miners had gone down into the mine in the morning. Each miner was supposed to take his own numbered check off the board, give it to the cager (elevator operator) or drop it into a pail kept by the cager, who in turn gives it to a man below who hangs the checks on a board below. Prior to March, 1943, it would seem that the record was made from the checkboard kept below in at least one of the mines. One of the defendant's mine clerks testified that a digger is supposed to take his right check number down in the mine, but doesn't always get the right number; lots of times he gets the wrong one instead of his own; and quite a few men never hang their checks on the board. These checks are sometimes lost. A mere description of the system brings out the numerous possibilities of error which it invites. In fairness to defendant, it should be stated that defendant's face bosses, each in charge of a section of the mine, are now checking their territory for absences daily, and are recording absences which are subsequently posted to the payroll record by the symbol "O.A." (own accord). A record of partial hours where a digger comes out early is being kept from checks returned to the board, and noted on the payroll record as a partial day. Thus a miner is assumed to be present in the mine for a full day of seven hours,[1] unless the payroll sheet or original attendance record indicates an absence or partial day. The payroll should show for each employee the hours worked, regardless of whether assumed or actual. We have scrutinized the exhibits certified to us, but have been unable to discover this information. If a man is credited with seven hours for each day he had coal up and was not marked absent, the records are clearly deficient in failing to show excess compensation for overtime.

We shall not detail the instances of inaccuracy recited in the record. Some of these defendant has succeeded in explaining; some it has not. Suffice it to say that in our opinion, the mistakes were not isolated instances caused by human frailties, but rather inevitable results from a faulty system. Nor are we persuaded that a more practicable system could not be worked out. For example, the elevator

---

[1] By agreement the question of whether travel time spent by the diggers between the portal and the face of the mine constituted working time was eliminated from the case.

operator took only eight men down at a time, so it would seem that he could easily note who they were by either number or name. Defendant's argument that it could not keep an absolutely accurate check on the hours actually worked by the diggers because each digger works in a room by himself, fails because it does not meet the issue. There is no complaint about giving the man credit for the time he is in the mine as working time. The complaint is that the working time is not properly recorded on the books or payroll record. Defendant's excuse is unsound since the Act is being successfully applied to thousands of miners and other employees where they are not under the employer's continuous surveillance.

■ The so-called attendance record was the only record which the company kept of the men's working time. Certainly, for inspection purposes, it was not in a form easily obtainable. More serious than that was its untrustworthiness. Thus defendant's general superintendent testified that it was not very reliable and its chief mine clerk testified that the fact that a particular digger was not shown absent on an attendance record was no guarantee that he was there. In effect, defendant was impeaching its own records when it objected to the Administrator's reliance on it. Defendant's own exhibits prepared for purposes of the trial freely ignored the attendance records whenever defendant's suprintendent considered the amount of coal produced too small for the time shown on the attendance records. He explained discrepancies between the attendance records and the records prepared for exhibits by the fact that he determined the days in which a particular miner worked "from the amount of coal" produced. He admitted that when a miner had less than two tons of coal to his credit, "there was no way of knowing whether

he worked that day." This intuitive system of determining time spent by the amount of coal produced is unsatisfactory not only because it was not what it purported to be but also because it was not a mere copying of something which appeared on the payroll record, or other books, of the company. Moreover, any record of hours worked could only be laboriously compiled from other records by someone intimately familiar with defendant's record-keeping system. We think that the Administrator's regulations contemplate that the company's books shall plainly and objectively show the hours worked, even though the men are paid on a piecework basis. Walling v. Black Diamond Coal Mining Co., D.C. W.D.Ky.1943, 59 F.Supp. 348; Walling v. Reilly, D.C.E.D.Pa.1944, 59 F.Supp. 740; cf. United States v. Rosenwasser, 65 S.Ct. 295.

■ Defendant's claim that it must be excused from keeping the records required by the Administrator because it is not "commercially feasible" to keep them is simply not tenable. The Act places the duty of keeping accurate records squarely on the employer and the regulations prescribe this duty, so failure to comply with these regulations constituted cause for issuing an injunction. Walling v. Partee, D.C.W.D.Ark.1944;[1] Walling v. Reilly, supra; Walling v. Fox-Pelletier International Detective Agency, D.C.W.D.Tenn.1944;[1] Fleming v. Pearson Hardwood Flooring Co., D.C.E.D.Tenn.1941, 39 F.Supp. 300, 303; Walling v. Peavy-Wilson Lumber Co., D.C.W.D.La.1943, 49 F.Supp. 846; Walling v. Sun Publishing Co., D.C.W.D.Tenn.1942, 47 F.Supp. 180, affirmed 6 Cir., 140 F.2d 445. Any other holding would open the door to widespread violations.

The District Court's decree is vacated and the cause is remanded for further proceedings not inconsistent with the views herein expressed. It is so ordered.

---

[1] No opinion for publication.