288 F.2d 778
 Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Appellant,
v.
KICKAPOO PRAIRIE BROADCASTING CO., Inc., a Corporation, and KLRS Broadcasting Co., a Corporation, Appellees.
Arthur J. GOLDBERG, Secretary of Labor, United States Department of Labor, Appellant,
v.
KICKAPOO PRAIRIE BROADCASTING CO., Inc., a Corporation, and Roger H. Taylor, Neosho Broadcasting Company, Inc., a Corporation, and KLRS Broadcasting Co., a Corporation, Appellees.
 No. 16540.
 No. 16541.
 United States Court of Appeals Eighth Circuit.
 April 5, 1961.
 
 Jacob I. Karro, Deputy Asst. Sol., U. S. Dept. of Labor, and John Weiss, Atty., U. S. Dept. of Labor, Washington, D. C., for appellant; Harold C. Nystrom, Acting Sol. of Labor, Judah Best, Atty., U. S. Dept. of Labor, and B. Harper Barnes, Regional Atty., U. S. Dept. of Labor, Washington, D. C., on the brief.
 B. H. Clampett, Springfield, Mo., for appellees.
 Before JOHNSEN, Chief Judge, and VOGEL and BLACKMUN, Circuit Judges.
 VOGEL, Circuit Judge.
 
 
 1
 The Secretary of Labor commenced these two actions under the Fair Labor Standards Act of 1938, as amended, §§ 201-219 of Title 29 U.S.C.A.
 
 
 2
 No. 16,540 was brought to recover from the defendants Kickapoo Prairie Broadcasting Company and KLRS Broadcasting Company unpaid minimum wages and overtime compensation claimed to be due employee Hazel O. Waltman.
 
 
 3
 By No. 16,541 the Secretary sought to enjoin Kickapoo, Neosho Broadcasting Company, KLRS Broadcasting Company and Robert H. Taylor from violating the Act's compensation and record-keeping requirements, §§ 15(a) (2) and 15(a) (5). The cases were consolidated for purposes of trial.
 
 
 4
 It was conceded that the Act was applicable and that the defendants' employees were covered. The defendants denied the violations. The trial court in No. 16,541, while finding "daily irregularities and minor inaccuracies" which constitute "a technical violation of the Act", and that "violations existed, but the overall impression is that they were innocent violations" denied the injunction. In No. 16,540 the trial court found the testimony sharply disputed, that plaintiff "failed to sustain the burden of persuasion" and denied recovery. 182 F. Supp. 578, 584.
 
 
 5
 In appealing the Secretary contends (1) that the trial court's denial of the injunction exceeded its discretion since defendants failed to make corrections after they had been warned about their fictitious time records, and (2) that the court erred in not approximating the compensation due employee Waltman under the principles of Anderson v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515, rehearing denied, 329 U.S. 822, 67 S.Ct. 25, 91 L.Ed. 699, claiming the evidence established that she performed work not reported and for which she was not paid.
 
 
 6
 During the period of alleged violations, March 3, 1956, to March 7, 1958, Kickapoo owned and operated two radio stations, KICK at Springfield, Missouri, and KLRS at Mountain Grove, Missouri. Kickapoo's principal office was located at Springfield. Neosho was engaged in radio broadcasting at Neosho, Missouri, under the call letters KBTN. In November or December, 1958, subsequent to the filing of these actions, Kickapoo sold radio station KLRS at Mountain Grove to the newly-formed KLRS Broadcasting Company, a corporation. All three corporations, Kickapoo, Neosho and KLRS, were owned by defendant Taylor and two other individuals. During a pre-trial conference held on March 17, 1959, it was disclosed that Neosho had been sold to a third party and that the sale was with the F.C.C.'s approval. Taylor was the owner of one-third of the stock of Kickapoo and KLRS. He also owned stock of Neosho and was secretary-treasurer of the three corporations.
 
 
 7
 In the latter part of 1956 Taylor assumed general control of the payroll practices at Neosho, Mountain Grove (KLRS) and Springfield (KICK), a position maintained by him thereafter.
 
 
 8
 The payroll record-keeping practices for the three stations were essentially the same. For a short time during the period involved time clocks were used but after protests and objections on the part of various employees, the time clocks were removed. Thereafter a system was instituted by which each employee was supposed to keep track of and make out his own time records. Such records consisted of time sheets which were mimeographed so as to show the days of the week and the time worked each day. Each employee was supposed to fill in the on and off time, total the number of hours for each day and show total hours worked at the end of each week. There was a place for computation of wages and certification as to the correctness of times worked to be signed by the employee. After each weekly time sheet was filled out and signed by the employee, it was delivered to the local station manager, who himself certified as to the accuracy of times worked. The time sheets were then forwarded to the Springfield office where checks were prepared. Finally, the checks with the time information were sent to Mr. Taylor's office for his approval and signature.
 
 
 9
 There was testimony that hours were typed out on cards for the employees to see when they made out their weekly time sheets. They either copied them off the card or a typist typed them in for them.
 
 
 10
 It was the contention of the Secretary, and substantial testimony by many employees sustained his contention, that the violations followed a regular pattern; that employees were required to report a scheduled number of hours each week, when in fact their hours exceeded the hours reported so that many times they were not paid time and a half for the periods exceeding 40 hours weekly.
 
 
 11
 It was the contention of the defendants, supported by the testimony of the defendant Taylor and some of the local managers, that the stations were organized so that they could be operated on a basis of 40 hours weekly for the employees; that except in an emergency they wanted overtime kept to a minimum; that no employee worked overtime for which he was not compensated; that the employees made out the weekly time sheets themselves, certifying as to correctness; that they were accurate and that payment was made in accordance with the information contained thereon.
 
 
 12
 While, as indicated, there was much disputed testimony, by far the greater weight thereof, as well as substantial uncontradicted testimony, showed violations of the Act. At Neosho the weekly time records for employee Tertzakian show almost without variation that he worked exactly 6 hours and 57 minutes each day Monday through Friday and 5 hours and 15 minutes on Saturday and that these figures add up to exactly 40 hours per week. When a variation did exist, the hours and minutes would, in most instances, still total exactly 40 hours per week. Tertzakian testified without specific contradiction that he was instructed to show only 40 hours on the time sheets, although in actual fact his work week was variable and averaged between 53 and 55 hours; that instructions came from the owners of the station to put only 40 hours on the weekly time sheets. Tertzakian claimed the local manager threatened him with immediate discharge if he did not comply with his wishes regarding the reporting of only 40 hours weekly. On occasions he signed time sheets in blank. Mrs. Betty Johnson, the secretary-bookkeeper, testified that she sometimes filled these in on instructions from the local manager, Morrison, in accordance with a schedule that Morrison had fixed up for them "to go by". Mrs. Johnson further testified that as to herself she was instructed by the local manager to record no more than 45 hours of work per week on her own time sheets, although she regularly worked 3 to 5 hours additional each week; that she did this to hold her job; that she was told not to turn in any overtime over and above what they were allowed; that if she did put down the additional overtime the local manager would make her re-do the time sheet; that she at first did not report this to the Wage and Hour investigator because she was afraid of losing her job. Evidence regarding the operation of KLRS at Mountain Grove was similar.
 
 
 13
 The weekly time sheets with reference to employee John Prickett at Neosho establish obvious violations. For each week, excepting one, there were two time sheets, the first covering Sunday through Friday, inclusive, with a total of 40 hours. The second, covering Saturday, showed 8 hours worked. For the first 40 hours he was paid at the rate of $1.00 per hour. For the 8 hours overtime on Saturday he was paid but $1.25 per hour, whereas, of course, the overtime pay should have been at the rate of $1.50 per hour. For the week ending July 27, 1957, the same thing occurred, with an underpayment for overtime. In signing and certifying as to the correctness of such particular time records, the local manager, Morrison, added on one time sheet the following note for the Springfield office:
 
 
 14
 "After this week John will have a set sallery of 50.00 weekly, as he is putting in close to 60 hours weekly. BM" (Emphasis supplied.)
 
 
 15
 Thereafter, with one exception, the weekly time sheets continue to show 40 hours worked Sunday through Friday and 8 hours on Saturday with payment at the rate of $1.00 per hour for the first 40 hours and $1.25 for the overtime. Accordingly, these time sheets show continuous underpayment for overtime worked and also establish that if Prickett was putting in close to 60 hours weekly as stated by the local manager, he was working 20 hours overtime instead of 8, that he should have received time and a half for the overtime or a weekly wage of $70.00 instead of the $50.00 indicated by the local manager and as paid according to the records.
 
 
 16
 On cross-examination Morrison, the local manager, was asked:
 
 
 17
 "Q. Did you tell Mr. Taylor that these employees, including Mr. Prickett, were working over forty hours a week at the time? A. I am sure Mr. Taylor realized it, from the reports that were going in to him, weekly."
 
 
 18
 Additionally, the local manager's note to the head office "* * * he is putting in close to 60 hours weekly" discloses full knowledge that the reported 48 hours was a false statement, although the local manager certified that "the above times are correct". There is here indicated a complete willingness to continue such false certification of records as to time and to continue marked underpayment. A salary of $50.00 per week for working 60 hours resulted in an hourly wage of approximately 83¢, with nothing additional for overtime. These were not technical violations or minor inaccuracies. False records known to be false and underpayments made knowingly negate any conclusion that only "innocent" violations were involved. In addition, the record discloses no indication on the part of the defendants that the violations of which they were aware would not be continued. In fact, the attitude of the defendants would appear to be that if the employees did not put down the correct hours, it was not their responsibility and they would do nothing about it.
 
 
 19
 Taylor testified that he told the investigator who reported the violations and gave warning:
 
 
 20
 "If there is anything wrong, Mr. Hurst, it would have to fall with the employees and the manager, because they have been instructed to put down their exact, correct time * * *."
 
 
 21
 This contention is untenable here under both the facts and the law. The facts disclosed that Taylor knew of violations, but even if that were not true and the local managers were the only ones who knew, the responsibility is nevertheless that of the defendants. Corporations can speak and act only through their agents. Here a knowledge on the part of the local managers that the records were false and that overtime was worked which was not paid for was knowledge of the corporate employers. In Hertz Driv-Ur Self Stations v. United States, 8 Cir., 1945, 150 F.2d 923, 929, this court held a corporate employer responsible for inaccurate records kept by the local branch manager:
 
 
 22
 "But Ashbaugh was the person who was conducting the corporation's business at its Kansas City branch; he was the one who made the entries; the law imposed on the corporation the duty of keeping correct records; and the making of false records by its manager must be held to be the criminal act of Hertz, Inc., as well as of Ashbaugh, within the purposes of the Fair Labor Standards Act."
 
 
 23
 In Lenroot v. Interstate Bakeries Corp., 8 Cir., 1945, 146 F.2d 325, 328, this court, speaking of another requirement of the Act, quoted with approval:
 
 
 24
 "As pointed out by Judge Cardozo, in People v. Sheffield Farms-Slawson-Decker Co., 225 N.Y. 25, 121 N.E. 474, 476, the mandate of the statute is directed to the employer and `he may not escape it by delegating it to others.' The `duty rests on the employer to inquire into the conditions prevailing in his business. He does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates. He must then stand or fall with those whom he selects to act for him. * * * the duty must be held personal, or we nullify the statute * * *.'"
 
 
 25
 In Walling v. Panther Creek Mines, 7 Cir., 1945, 148 F.2d 604, 607, the contention was made that the defendant should be excused from keeping the records required under Section 11(c) of the Act because it was not "commercially feasible" to keep them. The court succinctly answered:
 
 
 26
 "The Act places the duty of keeping accurate records squarely on the employer and the regulations prescribe this duty, so failure to comply with these regulations constituted cause for issuing an injunction. * * * Any other holding would open the door to widespread violations." (Emphasis supplied.) 148 F.2d at page 607.
 
 
 27
 See also Mitchell v. Hygrade Water & Soda Co., 8 Cir., 1960, 285 F.2d 362, 364.
 
 
 28
 Defendants rely upon the fact that the granting or denying of an injunction rests within the discretion of the trial court. While such is undoubtedly the rule, we believe that refusal here to grant the injunction on the grounds that the violations were "innocent" and "technical" was an abuse of that discretion. The violations were known to the defendants and yet no corrective measures or other indications of good faith were taken or made. In Tobin v. Anthony-Williams Mfg. Co., 8 Cir., 1952, 196 F.2d 547, 551, rehearing denied, May 29, 1952, we stated:
 
 
 29
 "We recognize that there is discretion in the trial court in issuing or refusing to issue an injunction pursuant to Section 17 of the Act. But in this case no showing was made to the trial court as to what would be done to bring defendant's records into conformity with the requirements of the Act. No officer of defendant stated that the defendant would or would not comply.
 
 
 30
 * * * * * *
 
 
 31
 "In that state of the record a case for issuance of injunction was clearly made out under the statute."
 
 
 32
 There, as in the instant case, evidence adduced on trial showed that defendants, after warning had been given, had failed to comply up to the time of trial and there was no showing as to what would be done to bring their records into conformity with the requirements of the Act.
 
 
 33
 Speaking for this court in Lenroot v. Interstate Bakeries Corp., supra, 146 F.2d at page 327, Judge Woodrough stated:
 
 
 34
 "It is true that the granting or withholding of injunction under section 17 is not mandatory. There remains a discretion in the court. But it is settled that it must be exercised in the light of the objective of the Act to abolish `oppressive child labor,' and must be measured by the standards of the public interest in putting an end to that evil and not by the requirements of private litigation."
 
 
 35
 While we were concerned there with the child labor provisions of the Fair Labor Standards Act, yet the principles enunciated regarding the trial court's discretion are equally applicable to the case at bar. Employers' lip service to a law, with a background of violations, is a poor guarantee of future compliance. Lenroot v. Kemp, 5 Cir., 1946, 153 F.2d 153, 157. In Walling v. Panther Creek Mines, supra, the principal issue was whether defendant's record-keeping system met the legal requirements of the Act. After noting that the granting of an injunction lies within the trial court's discretion, the opinion continues in language especially pertinent to the instant case:
 
 
 36
 "On the contrary, the challenged practices are continuing, and defendant asserts that they are lawful. No promise has been made to discontinue or correct them. The trial court was of the opinion that the defendant may have committed violations of the Act, and if it did, the violations were only `technical.' Thus the question boils down to whether the practices are illegal, for if they are, since the standards of the public interest, not the requirements of private litigation, measure the need for injunctive relief, an injunction should be issued. * * * "* * * where the evidence clearly shows existing violations and the likelihood, indeed, the virtual certainty, of future violations, a decision denying an injunction will be reversed. Goshen Mfg. Co. v. Myers Mfg. Co., 242 U.S. 202, 37 S. Ct. 105, 61 L.Ed. 248; Hughes Tool Co. v. Owen, 5 Cir., 123 F.2d 950; Walling v. Mid-Continent Pipe Line Co., 10 Cir., 143 F.2d 308." 148 F.2d at page 605.
 
 
 37
 Here there was "virtual certainty" of future violations since defendants deemed their record-keeping system "excellent" and apparently, therefore, did not contemplate making it accurate.
 
 
 38
 We think it was error on the part of the trial court to deny the injunctive relief. In so holding, we observe that injunctive relief is not punitive but remedial — if defendants "comply with the law they lose nothing by the injunction." Mitchell v. Southwest Engineering Co., 8 Cir., 1959, 271 F.2d 427, 432.
 
 
 39
 We next consider No. 16,540, the suit brought by the Secretary to recover for alleged unpaid minimum wages and overtime compensation for Hazel O. Waltman. Mrs. Waltman was employed in the operation at Mountain Grove, station KLRS, from August, 1956, until she was discharged in February, 1958, for being a trouble maker. She testified that in order to keep her job she had to falsify her time sheets to show only 40 hours, thus not reflecting the many hours of overtime worked and not compensated for. In so testifying she relied upon secret time records allegedly kept by her beginning shortly after her employment. After her discharge she wrote to Taylor on February 15, 1958, making a demand for two weeks' severance pay based upon a so-called unwritten law but omitting any reference in her letter to unpaid overtime, although she stated in her testimony at the trial that she had complained about the overtime to the local manager and to Taylor prior thereto. Subsequently, on March 3, 1958, she wrote a second letter to Taylor, again demanding the two weeks' severance pay and on this occasion calling attention to "many hours of overtime without pay that I have been forced to put in." As to this particular employee, the trial court found:
 
 
 40
 "Plaintiff and Mrs. Waltman place principal reliance on three day books or daily memoranda prepared by Mrs. Waltman and alleged by her to be a complete and accurate record of the hours worked by her from August, 1956, to February, 1958.
 
 
 41
 "I have examined these time books carefully. Although it is alleged that they were kept on a daily basis, it is perfectly apparent from examining them that they were not so kept. Obviously, substantial blocks of them, covering weeks at a time, were completed at one sitting, and were not kept on a daily basis at all. Even if the other evidence in this claim was not contradictory and of questionable basis, there would be no way of approximating or estimating the exact number of hours claimed to have been worked by her.
 
 
 42
 "These documents, taken in connection with the generally unsatisfactory and unimpressive testimony of Mrs. Waltman herself, force the conclusion that plaintiff has failed to sustain the burden of persuasion that exists in a proceeding of this character."
 
 
 43
 We, too, have examined Mrs. Waltman's time books with care and conclude that the trial court's appraisal of them was amply justified. Additionally, and we think this quite significant, they are established as patently false, at least in the beginning period of her employment. During such period time clocks were used and Mrs. Waltman's time cards show that daily she checked into work at anywhere from eight a. m. to many minutes late, one time almost an hour late, yet the private record made up by her indicates that she appeared punctually on each one of these days at eight o'clock. The conclusion is forced that her private record was unworthy of belief.
 
 
 44
 In her first letter of complaint regarding her discharge and in which she asked for severance pay, the omission of any reference to overtime is significant. We conclude that the trial court was on a sound basis when it held there was a failure of proof as to this particular employee. We do not find the situation comparable to that referred to by the Supreme Court in Anderson v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515, rehearing denied, 329 U.S. 822, 67 S.Ct. 25, 91 L.Ed. 699. There the Supreme Court stated, 328 U.S. at page 687, 66 S.Ct. at page 1192:
 
 
 45
 "In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."
 
 
 46
 Here the Secretary did not carry out his burden of establishing that Mrs. Waltman in fact performed work for which she was improperly compensated and accordingly there was no shifting of responsibility to the employer to come forward with evidence as to the precise amount of work performed nor justification or basis to award damages that might be only approximate.
 
 
 47
 No. 16,540 is affirmed.
 
 
 48
 No. 16,541 is reversed with directions to enter the requested injunction.