**Lester J. ALBRECHT, Appellant,**

v.

**The HERALD COMPANY, a corporation, d/b/a Globe-Democrat Publishing Company, Appellee.**

**No. 18161.**

United States Court of Appeals
Eighth Circuit.

Oct. 20, 1966.

---

Gray L. Dorsey, Chesterfield, Mo., Bartley, Siegel & Bartley, Clayton, Mo., for appellant. Donald S. Siegel, Clayton, Mo., with him on the brief.

Lon Hocker, of Hocker, Goodwin & MacGreevy, St. Louis, Mo., for appellee.

Before MATTHES, MEHAFFY and GIBSON, Circuit Judges.

MEHAFFY, Circuit Judge.

This is a treble damage action under § 4 of the Clayton Act, 15 U.S.C.A. § 15,

for violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1.

Lester J. Albrecht (hereafter plaintiff) appeals from a judgment entered pursuant to a jury verdict finding for The Herald Company, a corporation, d/b/a Globe-Democrat Publishing Company, defendant-appellee (hereafter Globe-Democrat). We affirm.

For many years the Globe-Democrat has been a morning newspaper in St. Louis, Missouri, delivered to home customers of the St. Louis and other areas through a system of 172 routes. Globe-Democrat carriers are entrepreneurs, purchasing their papers at wholesale and selling them at retail. Plaintiff owned and operated Route 99 in the City of Kirkwood, St. Louis County, said route consisting of some 1200 customers.

Globe-Democrat advertised in its newspaper a suggested retail price. Each carrier had an exclusive territory but was subject to termination *inter alia* for charging more than the suggested retail price. In case of termination, the carrier was given sixty days to provide a satisfactory purchaser for his route. Plaintiff had knowledge of Globe-Democrat's written price policy.[1]

Plaintiff adhered to the suggested retail price for several years but started overcharging in 1961. He admittedly received calls from Globe-Democrat about reported overcharging in 1961 and 1962. Finally, on May 20, 1964 Globe-Democrat wrote plaintiff as follows:

"The Globe-Democrat Publishing Company has received and referred to you a large number of complaints from customers in the territory you are servicing as a carrier that you are charging subscribers more than the publisher's suggested retail price.

"The system we customarily follow of respecting as exclusive territories of our carriers prevents the normal effect of competition to keep prices down. In order to protect the reading public against artificially high prices in restraint of trade in the territories of overpricing carriers, we have expressed in our statement of policy the intention to compete in such territories by selling the Globe-Democrat at retail ourselves or for resale by another carrier at the lower prices in the over-priced territory.

"In accordance with this policy, we are sending to each resident of your appointed territory the enclosed letter."

The enclosed letter advised the residents of the territory that some subscribers were being overcharged and that the Globe-Democrat would deliver the paper at the suggested retail rate.[2] These letters evidenced Globe-Democrat's decision to compete and provide its readers with the paper at the suggested rate. In addition, Globe-Democrat directed the Milne Circulation Sales Corporation, a national firm with a St. Louis office, whose business it was to

1. "The right of each carrier whose appointment is effective to sell the St. Louis Globe-Democrat by home delivery in his territory, will be maintained exclusively to him under the terms of his appointment so long as the price at which such sales are made in his territory shall not be higher than the price therefor suggested by the publisher for such sales in the City or County in which such territory is located."

2. "It has come to our attention that some Kirkwood area readers of the Globe-Democrat who subscribe to our paper through Lester J. Albrecht, 634 North Harrison, Kirkwood, Missouri, an independent merchant, are being charged more

for the Globe-Democrat than our suggested retail price. The suggested retail rate for the Globe-Democrat for delivery by carrier is $1.60 per month for the daily paper, plus 20 cents for each issue of our weekend paper. In addition, the premium on reader insurance is 10 cents per week, if desired.

"If you are being charged more for the paper than our suggested retail rate, please advise us of this condition on the enclosed form and we will deliver the paper to you at the suggested retail rate.

"If you are not a regular reader of our paper, we know that you will find the Globe-Democrat stimulating, informative and exciting. Please fill in the enclosed form and we will start service at once."

procure readers for newspapers throughout the country, to engage in telephone and house-to-house solicitation to all the residents of the area in Route 99.[3] The customers thus procured—some new—some who had quit because of plaintiff's overcharge—some who changed to take advantage of the lower price—were furnished home delivery of the paper by Globe-Democrat personnel. This campaign resulted in a customer list of 314 by July 7, 1964. Globe-Democrat did not want to engage in the carrier business, and in July of 1964 advertised the new route as available without cost. George John Kroner took over the route. Kroner, a route carrier in another neighborhood, knew the Globe-Democrat would not tolerate overcharging. He knew why the route was given to him without charge and understood that he might have to return it to Globe-Democrat if plaintiff sold his route or discontinued his overcharging practice.

During this period and thereafter, Globe-Democrat continued to sell its papers to plaintiff and plaintiff continued to serve his customers. On June 1, 1964, Globe-Democrat again objected to plaintiff about overcharging and warned plaintiff that legal steps would be taken if necessary. Following this warning, a conference between plaintiff and Globe-Democrat took place. Plaintiff was told that he could charge any price he wanted, but unless the Globe-Democrat's policy was followed, the Globe-Democrat did not have to do business with him. Plaintiff continued his practice of overcharging.

On or about July 27, 1964, a representative of Globe-Democrat told plaintiff that the Globe-Democrat was not interested in being in the carrier business and would be happy if plaintiff would take the customers back so long as he charged the suggested retail price. Plaintiff made no commitment but left the meeting and made an appointment with his attorney to bring this lawsuit. On August 21, 1964, after institution of the suit, Globe-Democrat notified plaintiff of termination of his appointment as a Globe-Democrat carrier:

"We have received a copy of the Complaint which you have filed in the U. S. District Court asking damages from us in the amount of three hundred forty thousand dollars.

"It seems apparent that the prosecution of this action is clearly inimical to the purpose for which your appointment as carrier was made and you are hereby notified that your appointment as carrier is terminated.

"However, in accordance with our statement of policy, we will nevertheless give you the opportunity of producing a substitute whose credit, experience and efficiency is satisfactory to us, and we will not object to his appointment on the ground that he may be paying you in connection therewith. Under the circumstances, with the lawsuit pending, we believe that sixty days is a reasonable time for this purpose.

"Accordingly, we shall cease selling you newspapers on October 21st, 1964. In the meantime, we will be ready to interview any substitute you may wish to produce."

Thereafter, Globe-Democrat granted plaintiff an extension of nine days to consummate the sale of his route. He sold the route for $12,000.00, $1,000.00 more than he had paid for it, but less than he could have gotten if Globe-Democrat had returned Kroner's 300 odd customers then comprising Route 198. Despite the competition, plaintiff retained some 900 of his original 1200 customers.

This case went to the jury, which considered the sole question whether § 1 of the Sherman Act was violated by reason of a "combination" between the Globe-Democrat and plaintiff's customers or with Milne or Kroner. This was plaintiff's theory under his amended complaint. The original complaint was in two counts, the first of which plain-

3. Milne worked exclusively for the Globe-Democrat in the St. Louis area.

tiff dismissed before trial. During trial plaintiff amended Count II, eliminating the charges of conspiracy and agreements and charging a "combination" between the Globe-Democrat and "plaintiff's customers and/or Milne Circulation Sales, Inc., and/or George Kroner."[4] In charging the jury, the District Court used as its principal guide the teachings of United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).[5]

4. "Plaintiff by its motion to amend the Complaint now desires to eliminate from the consideration of the jury any reference to a conspiracy under Section 1 of the Sherman Act or an illegal agreement under Section 1 of the Sherman Act, and desires that the case be submitted to the jury solely on the question of a combination under Section 1 of the Sherman Act.

"Is that correct, gentlemen?

"Mr. Siegel: Yes.

"Mr. Dorsey: Yes. Thank you.

"The Court: Very well."

5. "The only ground of liability submitted to you, therefore, is the question of whether the defendant combined with some other person or persons to violate Section 1 of Title 15 U.S.C.A., providing 'Every contract, combination * * * or conspiracy in restraint of trade or commerce among the several states * * * is declared to be illegal. * * *'

"The effect of this act is to forbid combinations of traders to suppress competition, as competition, not combination, should be the law of trade.

"A combination is a concerted course of action between the defendant and one or more persons. This may be with an agreement either expressed or implied or it may be without an agreement. In order to have a combination there must be a common purpose either to accomplish an unlawful act by lawful means or to accomplish a lawful act by unlawful means. The purpose of the combination must be the applying of coercion in some manner which unduly hinders or obstructs the free and natural flow of commerce in interstate trade.

"A seller has the right under the law to announce a resale price policy and decline to sell to those persons who fail or refuse to adhere to this policy. Such action is not an unlawful combination in violation of the Sherman Act.

"A seller may not announce a suggested resale price and thereafter enter into a combination with another person or persons, which goes beyond the mere refusal to sell and applies corecive action to enforce or obtain adherence to the suggested resale price. This is an unlawful combination prohibited by the Sherman Act.

"This is true whether the suggested price is a minimum price of (sic) a maximum price.

"Nothing in the Sherman Act requires that a seller of a product must grant to a customer the exclusive right to resell the product in a given territory, and for this reason it is not a violation of the act for the seller of a product either to complete (sic) in good faith with his own customer in a given territory or to permit any other customer to compete with him in that territory. Indeed, it is not a violation of the act for the seller of a product to announce, so long as he neither conspires or combines with another person for this purpose, that he will refuse to sell to any customer who does not, in turn, resell at the suggested resale price or to make adherence to the suggested price a condition to the maintenance of the exclusive right to sell in a particular territory, nor to terminate commercial relationships with a customer who does not adhere to the suggested retail price; nor is it a violation of the Act to refuse to deal with someone solely because he has brought a lawsuit against his supplier.

"The gist of the right of action claimed by the plaintiff under this Act is that the defendant combined with some other person in a combination designed to coerce the plaintiff to maintain adherence to the suggested retail price.

"To engage in 'competition' means to take actions which are calculated to acquire the business or customers of others in the sale of a product or commodity where the effort to gain that business or customers is made in 'good faith.' Good faith in this connection means for the purpose of engaging in the sale of that commodity or product, and getting customers for oneself, and not for the sole purpose of inflicting injury upon another by taking his customers away from him. Evidence showing good faith or bad faith is: whether or not the actor remains in that business after he has accomplished the injury; whether or not his acts and statements indicate that he is, in fact, intending to engage in that line of business or commerce for his own benefit and profit. Actions calculated to acquire customers or patronage, but not done in good faith, as indicated by the enumerated criteria, are, in fact, not competition.

"If you find that a combination was entered into between the defendant and

Restraint of trade embraces only acts, contracts, agreements or combinations which restrict competition or unduly obstruct due course of trade, thereby operating to the prejudice of the public. The Supreme Court said in Apex Hosiery Co. v. Leader, 310 U.S. 469, 493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940):

"The end sought [by the Sherman Act] was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services * * *."

and in Northern Pac. R. Co. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958): "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." See also United States v. American Linseed Oil Co., 262 U.S. 371, 388–389, 43 S.Ct. 607, 67 L.Ed. 1035 (1923); American Column & Lumber Co. v. United States, 257 U.S. 377, 400, 42 S.Ct. 114, 66 L.Ed. 284 (1921); Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 610, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); Kansas City Star Co. v. United States, 240 F.2d 643, 658 (8th Cir. 1957), cert. den., 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957); Feddersen Motors, Inc. v. Ward, 180 F.2d 519, 521 (10th Cir. 1950).

Globe-Democrat's activity here did not hinder, but fostered and actually created competition to the benefit of the public. To have condoned plaintiff's overcharging would have been a signal to all carriers, each monopolistic in his own right, to mulct the public for all the traffic would bear.

If Globe-Democrat's activities constitute a violation of the antitrust laws, it has only one alternative, and that is to terminate all home delivery carriers by the simple declination to sell. Globe-Democrat could then make the home deliveries by its own employees. It would thus automatically become a monopolist itself and wreck such havoc as Mr. Justice Douglas decried in his opinion in Standard Oil Co. of Cal. and Standard Stations v. United States, 337 U.S. 293, 318–319, 69 S.Ct. 1051, 1066, 93 L.Ed. 1371 (1949):

"But beyond all that there is the effect on the community when independents are swallowed up by the trusts and entrepreneurs become employees of absentee owners. Then there is a serious loss in citizenship. Local leadership is diluted. He who was a leader in the village becomes dependent on outsiders for his action and policy. Clerks responsible to a superior in a distant place take the place of resident proprietors beholden to no one."

The routes are valuable property rights owned by the 173 carriers. Car-

Milne Circulation Sales, Inc., and/or George Kroner and/or the plaintiff's customers, and pursuant to such combination the defendant or George Kroner or Milne Circulation Sales, Inc., solicited the plaintiff's customers for the purpose of coercing the plaintiff to follow the defendant's suggested retail price, then you shall find that the defendant violated the antitrust laws.

"If you find an unlawful combination was formed and that the defendant pursuant to such combination terminated the working relationship between itself and the plaintiff to coerce the plaintiff to follow the defendant's suggested retail price, or terminated because plaintiff refused to comply with the defendant's suggested

retail price, then this constitutes a violation of the antitrust laws, even if the right to compete or to terminate was reserved to the defendant in a statement of policy.

"If you find that no combination has been proved, then your verdict should be for the defendant; even if you find that a combination existed then before you may find for the plaintiff, you must find that damage resulting to the defendant was the result of this combination. In other words, if you find that the damage done to the plaintiff, if any, was caused not by the combination, then even though you find that such combination did exist, your verdict will be in favor of the defendant."

riers were dealt with fairly as shown by the evidence of profit ensuing and sale price of the routes. There is no suggestion in the record to the contrary. Moreover, it was Globe-Democrat and not the carriers which constantly sought additional customers to carriers' benefit through the exclusive employment of Milne Circulation Sales, Inc. for that purpose. Thus, if Globe-Democrat resorted to its only alternative, the cure would be worse than the disease. Globe-Democrat by becoming a monopolist would not benefit the public one whit. The facts in this case demonstrate, without question we think, no evil at which the Sherman Act struck. Furthermore, pursuing the alternative would destroy valuable property rights, and one of the purposes of Sherman was to preserve and protect property rights. The Supreme Court said in the first *Standard Oil* case, Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, at 78, 31 S.Ct. 502, 523, 55 L.Ed. 619 (1911), " * * * one of the fundamental purposes of the statute is to protect, not destroy, rights of property."

The principal issue is whether the record evidence compels, as a matter of law, a conclusion that Globe-Democrat participated in an unlawful combination in restraint of trade.

Home delivery of newspapers, for longer than anyone can remember, has been conducted by a system of exclusive routes. Practicality dictates this as a morning newspaper must be delivered to the homes of readers throughout the city by a certain time. When one of the witnesses was asked how long such a method of distribution had been used by Globe-Democrat, he answered "forever." Other than payment of bills and timely delivery of the paper in good condition, the only requirement of Globe-Democrat carriers was that the public not be overcharged. Obviously, this policy was adopted to comply with the antitrust laws by insuring competition necessary for the protection of the public. Home delivery by the route system is monopolistic, whether done through independent merchants such as plaintiff, or done by the publisher. The public's protection from the harmful effects therefrom can be guaranteed only by preventing overcharging through insuring competition.

█ Combination is usually defined as the union or association of two or more persons for the attainment of some common end.[6] Globe-Democrat did not combine with anyone. Its action taken to provide competition to plaintiff was completely unilateral. When customers started complaining and some discontinuing their subscriptions, Globe-Democrat warned plaintiff. When Globe-Democrat's repeated warnings were ignored, it offered plaintiff's dissatisfied customers its product at its announced price. It did this first by letter followed by telephone and door-to-door campaign. It delivered the customers thus obtained by its own employees. Globe-Democrat acted only through its employees and agents. All the while, it continued to sell papers at wholesale to plaintiff. Thus, it became a carrier itself in competition with plaintiff. Once Route 198 was established by Globe-Democrat, competition was *fait accompli*. It was only thereafter that the new route was given to Kroner. Even after this, Globe-Democrat attempted to persuade plaintiff to desist from overcharging. Plaintiff, however, filed this suit, which led to his termination as a carrier. Globe-Democrat had a legal right to terminate plaintiff for filing the lawsuit.[7] It had the right to decline to sell papers to him for good cause, no cause, or any cause except in conjunction with a scheme to violate the antitrust laws. United States v. Parke, Davis & Co., supra; United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed.

---

6. Joyce on Monopolies #1; Thornton Combinations in Restraint of Trade, ¶ 141, p. 96; Webster's Third New International Dictionary; Black's Law Dictionary, 4th Ed.

7. Plaintiff continued to service his route until consummation of its sale but in the interim desisted from overcharging.

992 (1949); House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867 (2nd Cir. 1962).

■ Ordinarily, the existence of restraint of trade is a question of fact for the jury's determination.[8] Plaintiff insists, however, that, as in *Parke, Davis & Co.*, the question here is one of law and not of fact. If that be the case, our conclusion would be the same, as we are convinced that plaintiff failed to establish a Sherman Act violation.

Plaintiff argues that this case is controlled by *Parke, Davis* and the "per se" cases such as United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Neither *Parke, Davis* nor any of the "per se" cases are apposite in fact to the case at bar. Aside from the fact that plaintiff here eliminated any charge of conspiracy or agreement; that no combination whatsoever existed; and there was no coercion other than providing legal competition, the record evidence reveals many obvious distinctions from any of the reported cases relied upon by plaintiff.[9]

As examples, none of the cited cases involves a business whose product must be delivered daily at a certain time by a monopolistic delivery man; and in none does the sales price of the product to the consumer represent only a fraction of the cost of the product.[10] In none is the only alternative a monopoly leaving unprotected the public interest. In none did the only alternative result in destruction of valuable property rights which the Sherman Act seeks to protect. In none did the producer continue to sell to the distributor on the same terms, but also provide the public with the alternative to purchase the product at a lower price.

Plaintiff's reliance on *Parke, Davis* is misplaced. The Court there found an illegal combination violative of the Sherman Act:

"In thus involving the wholesalers to stop the flow of Parke Davis products to the retailers, thereby inducing retailers' adherence to its suggested retail prices, Parke Davis created a combination with the retailers and the wholesalers to maintain retail prices and violated the Sherman Act." Supra, 362 U.S. at 45, 80 S.Ct. at 512.

Contrarily, in the instant case Globe-Democrat's activities were unilateral and no combination was formed. At this juncture, Globe-Democrat had not gone so far as to decline to sell—it continued to sell to plaintiff at the same price. After competition was established, plaintiff retained some 900 of his original 1201 customers. Only later when plaintiff brought suit was he terminated. Even then the Globe-Democrat continued to sell him until he sold the route.

Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259 (1951), furnishes plaintiff with his strongest "per se" argument. *Kiefer-Stewart* is inapposite as in that case an agreement exist-

---

8. In Winn Ave. Warehouse, Inc. v. Winchester Tobacco Warehouse Co., 339 F. 2d 277, 280 (6th Cir. 1964), the court stated, "Whether a restraint is unreasonable or whether there is any restraint is a question of fact. [Citations omitted.]" Compare Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

9. Not cited is the case most closely akin: Graham v. Triangle Publications, Inc., 233 F.Supp. 825 (E.D.Penn.1964). The court there held that the newspaper's resale price policy was maintained and enforced within the permissible bounds of *Colgate* and *Parke, Davis.* On appeal, the Third Circuit by per curiam opinion (344 F.2d 775 (1965)) refrained from passing on the legal issues in holding only that the District Court did not abuse its discretion in refusing to award a preliminary injunction.

10. The principal income of a newspaper is derived from its advertising. Its advertising rates are based on its circulation which is the lifeblood of a newspaper and accounts for utilization of such agencies as Milne here in a constant effort to increase circulation. For statistics on advertising revenue, see Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

ed among competitors to fix a maximum resale price, thus forming an illegal combination. In *Kiefer*, there was no route system necessary, no timely home delivery required, and no natural monopoly involved whether done by the producer or distributor.

We will not unduly burden this opinion by demonstrating distinctions between this and other cases, but it can safely be said that commencing with the first case under the Act, United States v. E. C. Knight Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed.2d 325 (1895), and continuing through United States v. General Motors, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), all reported cases are readily distinguishable from the case at bar.

■ The Supreme Court in United States v. Hutcheson, 312 U.S. 219, 230, 61 S.Ct. 463, 465, 85 L.Ed. 788 (1941), said, "[b]y the generality of its terms, the Sherman law had necessarily compelled the courts to work out its meaning from case to case." It is because of the generality of the terms of the Act coupled with the complexity of modern business that such rules as *Parke, Davis* and the "per se" became necessary for the public's protection. The basic purpose—the ratio decidendi—of the Sherman Act was protection of the public interest and preservation of freedom of competition. We, therefore, cannot construe the Sherman Act to compel Globe-Democrat to pursue a course which would restrict competition to the prejudice of the public interests.

"[N]othing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurb conclusion." In Re Chapman, Petitioner, 166 U.S. 661, 667, 17 S.Ct. 677, 680, 41

L.Ed. 1154 (1897); Lau Ow Bew v. United States, 144 U.S. 47, 59, 12 S.Ct. 517, 36 L.Ed. 340 (1892); State of Maryland, to Use of Burkhardt v. United States, 165 F.2d 869, 872 (4th Cir. 1947).

The rule of reason conceived in the original *Standard Oil* case, supra, is but a rule of common sense and must be applied to the instant case if the public is to be protected.

Those familiar with the historical background of the Sherman Act will recognize that none of Globe-Democrat's actions resembles the evils that led to the enactment of the statute. It must be conceded that the Globe-Democrat could have declined to do business with plaintiff and deliver the papers itself or through another with impunity. Globe-Democrat did not go this far and should not be penalized for its plan to protect the public against overcharging. Neither should plaintiff be rewarded for his avarice. A common sense consideration of the record evidence compels the conclusion that Globe-Democrat's action in providing competition did not remotely restrain trade, but, contrarily, fostered competition, and, therefore, our conclusion is consistent with the Sherman Act and the teachings of the Supreme Court.

■ As a subsidiary issue, plaintiff contends the court erred in instructing the jury that in order to have a combination, there must be a common purpose either to accomplish an unlawful act by lawful means or to accomplish a lawful act by unlawful means. This was the plaintiff's theory of the case and the only basis for recovery alleged in his complaint as amended. It was the theory upon which the case was tried and upon which plaintiff's counsel argued to the jury.[11] It is too late after conclusion of the evidence for plaintiff to shift theories. Cf. Armstrong Cork Co. v.

11. Counsel's statement to jury:

"The issue involved in this case is a relatively simple one. We have tried to eliminate from the Complaint those matters which we thought might be confusing and somewhat repetitious or redundant in the way of claims in this matter; so that this case is now boiled down to the simple, single issue, so far as liability is concerned, as to whether or not the defendant entered into an unlawful combination with Milne or Kroner or plaintiff's customers in an effort to try to obtain adherence to the defendant's suggested retail price."

Lyons, 366 F.2d 206 (8th Cir. 1966), and cases there cited; Whiteside v. W. T. Bailey Lumber Co., 274 F. 96 (8th Cir. 1921) and Bracken v. Union Pac. R. Co., 75 F. 347 (8th Cir. 1896). In any event, this assignment of error, as well as the others relating to the court's refusal to give certain proffered instructions, is of no consequence by reason of our conclusion that the undisputed evidence fails to show a Sherman Act violation.

The judgment is affirmed.