George P. SHULTZ, Secretary of Labor, United States Department of Labor (Successor to W. Willard Wirtz, Resigned), Plaintiff,

v.

CIRCULATION SALES, INC., and Earl R. Milne, doing business as Circulation Sales of St. Louis, Defendants.

Civ. A. No. 68C 56(1).

United States District Court
E. D. Missouri, E. D.

April 25, 1969.

Judgment June 2, 1969.

Veryl L. Riddle, U. S. Atty., by Jim J. Shoemake, Asst. U. S. Atty., St. Louis, Mo., and Charles Donahue, Sol., Harper Barnes, Regional Atty., and John Weiss, Atty., U. S. Dept. of Labor, Kansas City, Mo., for plaintiff.

Kenneth Teasdale, Sr., St. Louis, Mo., and Cassidy & Enright, Detroit, Mich., for defendants.

## MEMORANDUM OPINION

HARPER, Chief Judge.

This is a suit under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq., in which the Secretary under section 17 seeks to enjoin the defendants from violating the minimum wage, overtime and record-keeping provisions under section 15(a) (2) and (a) (5), and further for the restraint of any withholding of minimum wage or overtime compensation. The basic contention of the defendants is that they are without the coverage of the Act in that they are independent contractors, engaged in a "service" business, and that the employees involved, the telephone solicitors, are not engaged in interstate commerce nor in the production of goods for commerce.

If the Act is applicable to the businesses involved under the new enterprise coverage of section 203 or if it is applicable to the employees involved under the traditional coverage provisions, there is no doubt as to the violation of the minimum wage, overtime and record-keeping provisions. From the evidence it is unquestionably clear that the defendants have made no effort to comply, believing themselves to be outside the coverage of the Act.

The testimony, exhibits and stipulations of the parties reveal the following facts:

Prior to the creation of the defendant, Circulation Sales, Inc., the defendant, Earl R. Milne, was the president of another Michigan corporation, Milne Circulation Sales, Inc., formed on October 25, 1958. This corporation conducted the same basic business as does this defendant, with many, if not all, of the same customers (excepting those new ones). However, Milne Circulation Sales, Inc., apparently utilized a different form of organization.

On April 12, 1966, the name, Circulation Sales of St. Louis, was registered under the Missouri Fictitious Name Statute. On April 18, 1968, the defendant, Circulation Sales, Inc., was incorporated in Michigan. This corporation is owned by the same individuals who previously owned the Milne corporation, with the addition of one new stockholder. In addition, the stock of the new corporation is held in different proportions and the stock structure is different.

In the year 1966, the Department of Labor was in the process of investigating Milne Circulation Sales, Inc., and as a result of this investigation litigation was commenced in the United States District Court in the District of Maryland. That litigation, charging a violation of the Fair Labor Standards Act, was terminated on May 23, 1966, when a consent judgment was entered. On that same day, the Milne Corporation was adjudicated voluntarily bankrupt. At this juncture the St. Louis operation of Milne was being run by one James McDowell. This individual was the one who registered the name of Circulation Sales of St. Louis. He was denominated the "franchisee" of the new corporation and continued business in St. Louis without interruption or change in customers or method of operation. In June of 1966, McDowell retired and Earl R. Milne became the "franchisee" and purchased the assets of the franchise for some $200.00.

As mentioned, the sole differentiating factor between the business of the two corporations is one of form except for one new stockholder and the stock structure. While the evidence does not present a very clear picture of the oper-

ation of Milne Corporation, it appears that it operated directly in the cities in which it had a contract to procure subscriptions. Circulation Sales, Inc., has on the other hand adopted the "franchise" form of operation. Circulation Sales, Inc., procures contracts with various newspapers in the United States under the terms of which it is given the exclusive right to obtain new newspaper subscriptions for that paper. To do this, it conducts a concerted effort to acquire and maintain these contracts by advertising its business in national and local trade journals and other publications; by direct contact with the papers themselves; and by attendance, participation and advertising at various appropriate conventions throughout the United States. As a result of these efforts, it now has contracts with newspapers in some twenty-one cities scattered around the United States, and in the past has had some thirty others. The evidence indicates that the St. Louis operation is typical.

Circulation Sales, Inc., has an oral contract with the St. Louis Globe-Democrat newspaper. Its obligations under that contract are fulfilled by its local franchisee, Earl R. Milne. Under their arrangement, discussed more fully hereafter, Circulation Sales of St. Louis solicits new subscriptions for the Globe-Democrat. Those procured are in turn "sold" to Circulation Sales, Inc., at a rate fixed in the franchise agreement. Circulation Sales, Inc., then in turn sells these subscriptions to the Globe-Democrat at their agreed price. The Globe-Democrat pays Circulation Sales, Inc., by check deposited in the corporate account maintained at the City Bank in St. Louis. Circulation Sales, Inc., then issues the appropriate check to Earl R. Milne, d/b/a Circulation Sales of St. Louis, and mails this check to the City Bank for deposit in Milne's account. The local manager for Milne computes the commissions due the telephone solicitors and draws upon this account to pay them. If any subscription procured by a solicitor is canceled before nine weeks

have expired, or if the Globe rejects any subscription so obtained for any reason, the Globe makes an appropriate charge back to Circulation Sales, Inc., and so on until that charge is made against the commissions earned by the individual involved.

The franchise agreement with Earl R. Milne gives the corporation a wide breadth of control over the franchise operation. The franchisee is required to use the name, Circulation Sales of St. Louis, but is prohibited from using that name after the franchise is over. A minimum quota, here 2,000 new subscriptions per four weeks, is set in accordance with the corporation's contract with the paper involved. The franchisee's scope of operation is limited. The making or retention of customer or solicitation lists is prohibited. The corporation retains the right to audit all records. The corporation may require a cash bond upon request. The franchise may be terminated upon thirty days' notice. The franchisee may not join any other party in the business.

Further, the franchisee must solicit and sell in compliance with other terms and conditions set by the newspaper involved; and further, the corporation requires certain weekly progress reports and furnishes all of the forms necessary. The precise local territories in which sales presentations may be made are designated by the newspaper. The term for which the subscription must be offered is set, here thirteen weeks. The sales presentation forms are supplied and changed as the paper devises new gimmicks to enhance sales, such as a cash contribution to some charity in the name of the subscriber if he will subscribe now for thirteen weeks. In addition, the corporation is provided with free advertising service in the paper for solicitors, which the franchisee may, and here often did, use to hire the solicitors.

Although the franchisee is required to establish and maintain his own local solicitations operations, it is clear that much practical control is exercised and exercisable by the corporation and the

newspaper. In the instant case, the extent to which this is or was done is indefinable because of the identity of person and interest of the franchisee himself and the corporation's chief officer, Mr. Milne. It is clear that the franchisee did have some independent investment in the office equipment.

In 1967, the operation described led the Globe to pay some $258,611.00 to Circulation Sales, Inc., which in turn paid over $117,395.93 to the franchisee. The corporation's gross income for 1967 was in excess of one and one-half million dollars.

During the period from early 1966 through the present, there have been no breaks in the operation of the solicitors working at obtaining subscriptions even though there has been a major corporate alteration and several changes in ownership and control on the local level, nor were the solicitors themselves made aware of these corporate or ownership alterations.

The telephone solicitors, being those in question, are hired on a full or part time basis. There is little turnover in the full time workers. Before being hired these solicitors are required to sign an application and an agreement. The application (Exhibit 4, p. 1 of Plaintiff Trial Brief) sets forth "policy" and denominates the applicant as a self-employed independent contractor. The agreement continues with this terminology and under it the franchisee agrees to buy from the solicitor all subscriptions obtained with certain limitations. These documents are naturally in the proper form for establishing the independent contractor relationship and pursuant to the form, Circulation Sales of St. Louis does not deduct the solicitor's Social Security nor withhold income tax, and neither does it attempt to comply with the Fair Labor Standards Act. However, as is always the case, the substance of the work relationship and not the form of the contract controls.

The telephone solicitors work in a large room, sitting in pre-installed booths. In addition to the workers' booths, there is an observation desk used by the manager or his assistant. Each phone booth is equipped with the necessary order and solicitation forms and the current sales presentation is affixed in it. The telephone hook-up is such that the manager can monitor the conversations of the solicitors. This device is frequently used by the managers to check the sales presentations of the solicitors to insure that they are not making misrepresentations or being discourteous, or violating any of the requirements of the Globe in the presentation itself. In addition to this function, it is also used as a sales device with the solicitor requesting that the manager get on the line and verify the sale. Periodically, usually hourly, the manager or assistant makes a circuit of the booths, checking the progress of the solicitors, issuing additional instructions, giving encouragement, and attempting to spur the solicitors into greater production.

The area in which a given solicitor would call was not left to his choice. The Globe-Democrat through the series of agreements noted had the right to designate areas and it exercised this right. The solicitor would be given a designated area to call. These designations were made from the manager's desk noted above when the solicitor reported for work. The manager or assistant would either give the solicitor a specific list, instruct him to sequence dial a particular exchange, or allow the solicitor to select a prepared list from a stack on the desk, although at least one witness testified that in the use of the third method, they were required to take the topmost list in furtherance of the aim of systematic coverage of the area.

The solicitors would call from these lists. All the calls were made to the metropolitan St. Louis area, but no calls were made out of state. The solicitors would follow in general the current sales presentation affixed in the booth they were using.

Sales meetings were a common occurrence, often weekly. The testimony of the witnesses clearly indicates that these

meetings were designed to increase production. This was done by the usual means. In addition they were used as the vehicle for giving new instructions and new sales presentations and clearing up specific problems that the solicitors might have. There is some evidence that certain of the managers held these sales meetings informally on a daily basis. When Earl R. Milne was in town, about once a month, a meeting would be held. Further promotional devices, such as bonuses and prizes, were used to spur greater production.

Under the agreement previously mentioned, Circulation Sales of St. Louis agrees to buy all of the subscriptions which the solicitor acquires at an agreed rate and to furnish him with the facilities for calling at the office. The solicitor, in addition to the limitations of area, must also conform to the subscription rules and regulations of the Globe. Thus, the terms on which the sale is based are preset and the solicitor is given no latitude for bargaining. His commission is set on a take-it-or-leave-it basis. The application form has a blank for days and hours the applicant wishes to work, and also provides that he may call from home. In fact and in practice, only one of the solicitors testified that he made calls from home, and then only to follow up calls previously made at the office. The evidence further demonstrates that the solicitors worked regular hours and that the manager or his assistant exhorted and in effect required them to report regularly at eight-thirty a. m. The evidence indicates that the manager of Circulation Sales of St. Louis effectively regulated the starting and quitting times of the solicitors involved irrespective of the application form.

The solicitors bring to the job only their time, their voices, and writing utensils. They are paid at a set rate and negotiation is not permitted. If an order is rejected by the Globe, or is canceled by the subscriber so that a charge is made back against commissions, the solicitor involved has no opportunity to investigate the reason or to discover or correct the difficulty.

The Fair Labor Standards Act of 1938, as amended, is part of the social legislation of the depression days. It was passed before the range of power available to Congress under the Commerce Clause was fully developed. It did not, therefore, extend itself to all those activities "affecting commerce", thus reaching the limits of that power. Its coverage under sections 6 and 7 is limited to those employees engaged in commerce or in the production of goods for commerce.

Commerce is defined in section 3(b) as meaning:

"* * * trade, commerce, transportation, transmission or communication among the several States or between any State and any place outside thereof."

Production is defined in section 3(j):

" 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in the producing, * * * or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State."

■ In applying these provisions of the Act, courts have been guided by language such as that of the Eighth Circuit in Fleming v. Hawkeye Pearl Button Co., 113 F.2d 52, 56 (8th Cir. 1940): "The statute is remedial, with a humanitarian end in view. It is therefore entitled to a liberal construction." The statute is construed broadly, the exemptions are construed narrowly.

■ The second key rule, long ago established, is that in the application of the Act, "the character of the employees' activities" and not those of the employer's business governs. A. B. Kirschbaum Co. v. Walling, 316 U.S. 517, 524, 62 S.Ct. 1116, 86 L.Ed. 1638; Chambers

Construction Co. v. Mitchell, 233 F.2d 717, 720 (8th Cir.).

The government contends that the employees involved are subject to the Act under those portions of sections 6 and 7 which provide coverage for employees engaged in commerce or in the production of goods for commerce. The defendant argues on the contrary, that since the Congress in 1961 created a new enterprise coverage in those sections, and defined in section 3(r) and (s), and since those provisions exclude independent contractors, the defendants are not subject to the new coverage. Ipso facto, since the enterprise coverage was designed to extend the act, and since they are not within the purview of the new coverage, they could not be within the purview of the old. The court rejects this argument.

■ In the opinion of the court there are five ways in which the telephone solicitors are subject to the coverage of the act under the evidence presented: First, that they are engaged in commerce through their relationship with the Globe-Democrat; second, that they are engaged in the production of goods for commerce in their relationship with the Globe; third, through the enterprise coverage of section 3(r) and (s); fourth, that they are engaged in commerce through their relationship with the defendant, Circulation Sales, Inc; and fifth, that they are engaged in the production of goods for commerce through the relation with Circulation Sales, Inc. However, the government has urged only the first two bases, and the court will accordingly limit its discussion to those two.

The "engaged in commerce" test is the most difficult of the original tests to meet. Armour & Company v. Wantock, 323 U.S. 126, 131, 65 S.Ct. 165, 89 L.Ed. 118; Tobin v. Johnson, 198 F.2d 130 (8th Cir. 1952). While this is the case, the court is of the opinion that these telephone solicitors come within it.

In Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L. Ed. 162, the Supreme Court, in applying the Sherman Act, stated that local dissemination of national and international news "to the reading public is an inseparable part of the flow of the interstate commerce involved." There is no question as to the fact that the Globe-Democrat is engaged in interstate commerce in every sense of the word. See e. g., Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607; Lorain Journal Co. v. United States, supra; Albrecht v. Herald Company, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998.

■ In Walling v. Sun Publishing Co., 47 F.Supp. 180 (D.C.), aff'd 140 F. 2d 445 (6 Cir.), cert. denied 322 U.S. 728, 64 S.Ct. 946, 88 L.Ed. 1564, circulation employees of the paper were found to be engaged in commerce under the Fair Labor Standards Act. In view of the fact that it is the employees' activities which control, it is only logical that employees performing essentially the same functions should likewise be covered although the employer is different. It is rather clear from the cases that the engaged in test includes activities related "to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it." Overstreet v. North Shore Corp., 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656; Mitchell v. C. W. Vollmer & Co., 349 U.S. 427, 429, 75 S.Ct. 860, 99 L.Ed. 1196. In *Mitchell*, the court stated: "The test is whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity."

In applying this test, the following additional facts are essential. Some thirty percent of the advertising of the Globe is produced from sources out of the State of Missouri. Further, some nineteen percent of its papers are shipped beyond the boundaries of the state. In 1967, the solicitors of Circulation Sales of St. Louis were required to procure some 2,000 subscriptions per four-week period. In fact, they produced some 61,-836 thirteen-week subscriptions. This

amounts to over forty-eight percent of the Globe's average daily circulation. If limited to the thirteen-week period, the percentage would be twelve percent. Obviously, subscriptions are the horse which pulls the cart of advertising. The relationship is undeniably directly proportional. In the totality of the flow of news and advertising and its dissemination locally, clearly those who solicit subscriptions are "so directly and vitally related to the functioning as to be a part of it." There is no doubt that if the solicitors were Globe employees they would come within the coverage of the act. The mere fact that these people have a different employer does not remove them from that coverage where their activities are such an integral part of the described flow and chain of dissemination.

While dealing with the "engaged in" test it is also relevant to note that the defendant, Circulation Sales, Inc., is engaged in interstate commerce and that it is doing business in Missouri, or at least has sufficient minimal contacts here to warrant its presence here. As noted, this corporation conducts its activities on a nationwide basis. It rather clearly has a large number of contacts with this state. It has a major contract here, to be performed here. It buys subscriptions from a franchisee located here and then resells them to another business here. It maintains a bank account here and uses the mails to transact much business with its franchisee within the state. The same is true in twenty-one other cities scattered throughout the nation. By analogy to what has been said relative to these solicitors and the Globe, their relationship to the business of Circulation Sales, Inc., leads to the same conclusion, namely, that they are engaged in commerce under section 3 of the Fair Labor Standards Act of 1938.

A much stronger case exists for coverage under the "engaged in the production of goods for commerce" test. Section 3(j) includes within this phrase those engaged in a "closely related process or occupation directly essential to the production" of goods for commerce. That the obtaining of subscriptions fits this portion of the definition scarcely needs comment. Readers and buyers provide the bases for advertising which in turn supplies the basic revenue of a newspaper allowing it to gather, print and disseminate the local, national and international news. The obtaining of subscriptions is a keystone of the circle or cycle by which newspapers such as the Globe exist. For example, some seventy percent of the Globe's revenue is derived from advertising and "the rate for sale of advertising is closely related to the extent or circulation and number of St. Louis Globe-Democrat papers sold." (Exhibit 4, par. 1). In Albrecht v. Herald Co., 367 F.2d 517 (8 Cir.), Milne Circulation Sales, Inc., is singled out for its importance to the scheme of existence for the paper.

Since it is beyond question that the paper itself is an interstate commerce, the court is also of the opinion that the solicitors themselves are engaged in activities constituting an occupation directly essential to the production of goods for commerce. It is not necessary that the Globe be the employer to create this coverage. It is the nature of the employees' activities which are the governing concern regardless of the identity of the employer. For illustrative cases indicating the degree of relationship necessary for coverage see: Goldberg v. Mutual Reader's League, Inc., 195 F. Supp. 778 (D.C.); Chambers Construction Co. v. Mitchell, 233 F.2d 717 (8 Cir.); Tobin v. Johnson, 198 F.2d 130 (8 Cir.); Telephone Answering Service, Inc. v. Goldberg, 290 F.2d 529 (1 Cir.); Rural Fire Protection Co. v. Hepp, 366 F.2d 355 (9 Cir.); Mitchell v. Dooley Bros., Inc., 286 F.2d 40 (1 Cir.); Martino v. Michigan Window Cleaning Co., 327 U.S. 173, 66 S.Ct. 379, 90 L.Ed. 603.

Again, looking to the business of Circulation Sales, Inc., these solicitors are within the definition of production of goods test of section 3(j), in that they produce the subscription contracts which the franchisee sells to this Michigan cor-

poration which in turn resells them to a Missouri business. While the actual delivery of the contracts themselves may be direct, the paper sale travels in interstate commerce through the United States mails, as do the payments.

Finally, these solicitors are not independent contractors but are under the Act employees. In United States v. Rosenwasser, 323 U.S. 360, 362, 65 S.Ct. 295, 296, 89 L.Ed. 301, the Supreme Court noted, in considering the section 3(e) definition of employee, "A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame." In looking at the controlling substance of the employment arrangment, four cases seem decisive. Wirtz v. Silbertson, 217 F. Supp. 149 (D.C.); Walling v. Twyeffort, Inc., 158 F.2d 944 (2 Cir.); Goldberg v. Whitaker House Cooperative, Inc., 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100; and United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757.

The defendant places his reliance on the criteria stated in the *Silk* case. The *Silk* case itself deals with a specific exception in the Social Security Act. However, using its criteria, the solicitors can be nothing but employees. Their sole contribution is voice, time, and writing utensils. This alone defeats the contention of the defendants, as it is clearly insufficient to establish a true, as opposed to formal independent contractor, relationship. No independent judgment was allowed. No choice was even permitted as to the calling area. These facts, along with others pointed out above in the discussion of the work relationship lead to the inescapable conclusion that the telephone solicitors are in truth and fact employees. Form will not control substance.

The concern, and the sole concern in this case, is whether these telephone solicitors are covered by the act. We have found that they are. The status of the defendant, Circulation Sales, Inc., is not determinative of any issue herein. The same is true of Earl R. Milne, except for the fact that he is the employer of these

people. Coverage under section 3(r) and (s) was not asserted. While the court is of the opinion that such coverage in fact exists, that opinion is irrelevant here. The "independent contractors" exception of those sections has no bearing. That exception is limited to those subsections. Therefore, coverage of employees under other (the traditional) coverage sections is not affected by that limited grant of exclusion. The defendants' points in this respect are, therefore, without merit.

■ The sole remaining issue is the relief to which the plaintiff is entitled. The situation is not unlike that in Chambers Construction Co. v. Mitchell, supra, in which the Eighth Circuit quoted from Judge Delehant:

"It is of significance, too, that the defendants do not aver that they have changed their course in the violation of the Act; in fact, that they are before the court arguing that they need not change and that the Act does not and never did apply in favor of their employees. The defendants insist that they are here not as sinners doing penance but as among the just who need no penance." (233 F.2d at 725).

This quote is even more apropos where, as here, the defendant, Earl R. Milne, has previously been involved in similar litigation with his predecessor corporation and so knew what the policy of the Department of Labor was and would be in regards to his type of operation. There is no question as to the fact that the plaintiff is entitled to the injunctive relief requested as to the violations by the defendant, Earl R. Milne, as to the wage, overtime and record-keeping provisions of the Act. See e.g., Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515; Lenroot v. Interstate Bakeries Corp., 146 F.2d 325 (8 Cir.); Mitchell v. Southwest Engineering Co., Inc., 271 F.2d 427 (8 Cir.); Goldberg v. Kickapoo Prairie Broadcasting Co., 288 F.2d 778 (8 Cir.). See also, Walling v. Wyandotte Furniture Co., 169 F.2d 766 (8 Cir.); and Wirtz v. Malthor, Inc., 391 F.2d 1, (9 Cir.).

■ Therefore, pursuant to the authority contained in section 17 of the Fair Labor Standards Act of 1938, as amended, the defendant, Earl R. Milne, d/b/a Circulation Sales of St. Louis, will be permanently enjoined and restrained, along with his agents, officers, employees, successors, and those persons in active concert or participation with them, having actual notice, from violating the provisions of section 15(a) (2) and (a) (5), including the continued withholding of the back wages due to the employees. Since this court has determined that injunctive relief relative to the withholding of back wages due the employees is appropriate, under section 16 of the Act, the employees' right to seek these wages in their own behalf is lost. Wirtz v. Malthor, supra; Burk Builders, Inc. v. Wirtz, 355 F.2d 451, 453, (5 Cir.). Therefore, the court will also order that the parties involved confer and determine the amounts due the employees and submit those figures to the court for approval.

The final problem herein involved is the action to be taken against the defendant, Circulation Sales, Inc. There is as noted above, no problem as to jurisdiction over the corporation. Minimal contacts exist to the extent that the corporation is doing business in this state. However, none of the employees in question are employed by this defendant.

Injunctions under this act are designed to aid in the securing of compliance with the national policy as expressed by Congress in the Act. The courts are directed to use the injunction in light of the purposes of the Act and in aid of administrative efforts to enforce it. Mitchell v. Southwest Engineering Co., supra at 432 of 271 F.2d. As aptly pointed out in plaintiff's brief, in spite of the fact that the corporation is a separate legal entity, a former entity with the same stockholders, and the same principal officer, namely Milne, operating the same business, was enjoined on the same day it declared itself bankrupt, and then the new vehicle was put into operation in utter disregard of the litigation with the former entity.

It appears to this court that the inclusion of the defendant, Circulation Sales, Inc., is necessary to secure effective compliance with the Act. First, its officers had knowledge of the Act but allowed its "franchisees" to operate in violation thereof. Second, in view of past history, failure to include the corporation makes it likely that the corporation would set up a new franchise in St. Louis or set up some similar operation forcing the plaintiff to once again engage in litigation to secure compliance. Third, the relationship between the franchisee and the corporation is quite indistinct in that the franchisee and president are the same person. The corporation is, with the franchise, a means or instrumentality by which Milne engages in the subscription business in this district. The at-best fuzzy nature of the relation makes it imperative that the corporation be included to secure total and effective compliance. See Beneficial Finance Co. of Wisconsin, et al. v. Wirtz, 346 F.2d 341 (7 Cir.), and Chambers Construction Co. v. Mitchell, supra.

Therefore, the injunction issued will cover this defendant.

The plaintiff is directed to prepare and submit to this court the appropriate order encompassing the relief herein granted.

## JUDGMENT

This cause having been tried before the Court without a jury and the plaintiff appearing by his attorney, John Weiss, and the defendants appearing by their attorney, George L. Cassidy, and the individual defendant and president of the corporation, Earl R. Milne, being personally present, and the cause having been heard and testimony and exhibits received and briefs filed by both parties, and the Court having filed its Memorandum Opinion herein on April 25, 1969, wherein it was found that defendants were engaged in commerce and in the production of goods for commerce, with-

in the meaning of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. §§ 201–219), hereinafter called the Act, and have violated the provisions of the Act, in that they:

(a) have not paid their employees the minimum wage, as required by Sections 6 and 15(a) (2) of the Act, and overtime at time and one-half the employee's regular rate of pay, as required by Sections 7 and 15(a) (2) of the Act;

(b) have failed to keep and maintain records showing all hours worked by said employees, contrary to the provisions of Section 15(a) (5) of the Act, as required by the Regulations issued by the Administrator pursuant to Section 11(c) of the Act and found in Title 29, Code of Federal Regulations 516; and

(c) having found that the plaintiff was entitled to the restraint of any withholding of minimum wages or overtime compensation due the employees as provided in Section 17 of the Act;

Now therefore, pursuant to said Memorandum, which shall hereby serve as findings of fact and conclusions of law in this action,

It is, hereby ordered, adjudged and decreed that the defendants, their agents, officers, employees, successors, and those persons in active concert or participation with them, having actual notice of this order by personal service or otherwise be, and each of them hereby is, permanently enjoined and restrained from violating the provisions of Sections 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 et seq.), hereinafter referred to as the Act, in any of the following manners:

1. The defendants shall not, contrary to Sections 6 and 15(a) (2) of the Act, fail to pay to any of their employees who are engaged in commerce or in the production of goods for commerce, as defined by the Act, wages at rates not less than $1.60 an hour or not less than that rate which may become applicable by reason of amendment to the Act enacted subsequent hereto.

2. The defendants shall not, contrary to Sections 7 and 15(a) (2) of the Act, employ any of their employees who are engaged in commerce or in the production of goods for commerce for a workweek longer than 40 hours, unless the employee receives compensation for his employment in excess of 40 hours per workweek at a rate not less than one and one-half times the regular rate at which he is employed.

3. The defendants shall not, contrary to Sections 11(c) and 15(a) (5) of the Act, fail to make, keep and preserve adequate and accurate records of their employees and of the wages, hours and other conditions and practices of employment maintained by them as prescribed by the regulations of the Administrator issued and, from time to time amended, pursuant to Section 11(c) of the Act, and found in 29 Code of Federal Regulations 516, and shall make such records available at all reasonable times for inspection by representatives of the United States Department of Labor.

4. Defendants are hereby restrained from continuing to withhold unpaid minimum wages and overtime compensation due employees, and the parties and their attorneys are directed within 90 days of the date of this judgment to submit to the Court a summarization showing the names of employees and the amount of minimum wages or overtime compensation due employees, as nearly as can be ascertained, less appropriate legal deductions for social security and income withholding taxes, and the defendants shall deliver to the Regional Attorney, for the Office of the Solicitor, United States Department of Labor, Room 2106, 911 Walnut Street, Kansas City, Missouri 64106, a certified or cashier's check payable to "Wage and Hour—Labor" in the net amount due employees. A representative of the Secretary shall distribute the moneys to the named employees, or their legal representatives, and any such sum not paid out by the Secretary within a reasonable time (either because of his inability to locate the employees to whom

the money is due, or because of such person's refusal to accept payment) shall be covered into the Treasury of the United States as miscellaneous receipts. The Regional Attorney, upon receiving the check together with the recapitulation showing the deductions and the net amounts due employees, shall file a certificate or statement acknowledging the payment by defendants. If the parties cannot agree upon the amount of back wages due employees, they shall each file with this Court a list of the names of employees and the amounts which they contend are due the respective employees together with a short statement of their reason or position for such action or determination as may be necessary or appropriate.

It is further ordered that the costs be taxed against defendants.